**In re Nicholas E. MOORAD, Debtor.**

**Paul F. PARK, M.D., Plaintiff,**

**v.**

**Nicholas E. MOORAD, Defendant.**

**Bankruptcy No. 90–00037–C.**
**Adv. No. 90–0103–C.**

United States Bankruptcy Court,
N.D. Oklahoma.

Sept. 26, 1991.

Ronald Goins, Tulsa, Okl., for plaintiff.

J. Patrick Mensching, Tulsa, Okl., for defendant.

## AMENDED MEMORANDUM OPINION

STEPHEN J. COVEY, Chief Judge.

The Plaintiff filed a Motion for Summary Judgment upon the issues raised in his

**60**

Complaint under 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(4). Granting of the motion is appropriate, if the moving party can prove no issue of material fact can be disputed. The facts are to be viewed in a light most favorable to the nonmoving party, the Debtor. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court finds as follows.

## FACTS

In 1985, the Debtor and Victor E. McCall, M.D. ("McCall") decided to form a business partnership. For this purpose, each formed his own corporation. The Debtor became the President, director and sole shareholder of a corporation called Moorad Management, Inc. ("MMI") and McCall became the President, director and sole shareholder of McCall Management, Inc. These two corporations became the general partners of Tulsa Diagnostic and Imaging Center, a Limited Partnership ("TDIC").

Primarily, the business of TDIC was to facilitate the operation of a medical diagnostic and imaging practice to be conducted by the Debtor and McCall, both physicians. TDIC would lease a portion of the American Red Cross Building in Tulsa, Oklahoma, make improvements upon the leasehold for operation of the medical practice and lease medical equipment to be used in that practice. The owner of the building was Harvard Joint Venture, a joint venture which included the Debtor, McCall and Gyronics, Inc. TDIC would sublease the premises and equipment to Tulsa Medical Imaging ("Medical Group") a partnership to be formed between the Debtor and McCall. Revenues for TDIC would be the rentals received from the Medical Group. TDIC hired a consultant, George West, to prepare the various documents necessary to solicit and sell TDIC partnership interests to investors. West was an officer, director and shareholder of Gyronics, Inc.

In late 1985 and early 1986, the Debtor personally solicited numerous physicians, including the Plaintiff, to purchase units in the limited partnership. The key document in the sale of the units was the Confidential Private Placement Memorandum ("Memo") dated October 21, 1985, and distributed to prospective investors. The Memo informed investors that MMI and McCall Management, Inc. were TDIC's general partners. Debtor and McCall were, respectively, the sole shareholders of these corporate general partners. Each general partner was capitalized with $62,500.00, plus other assets. Each general partner would contribute $62,500.00 to TDIC for capitalization. Gyronics, Inc. and Diagnostic Management, Inc., ("DMI") another company of George West, would be hired as management consultants. West was also officer, director and shareholder in DMI. In a paragraph titled 'Fiduciary Responsibility of the General Partners,' the Memo clearly described the fiduciary duties of the general partners to include the "exercise of good faith and integrity in handling Partnership Affairs."

Under the 'Terms of Purchase' paragraph an escrow account was to be established at Fourth National Bank of Tulsa ("Fourth National") to hold the purchase money from investors. To purchase, each investor was to pay $12,500.00 in cash per unit, execute a $75,000.00 guaranty to cover the various lease agreements, a Power of Attorney authorizing the general partners to enter such guaranties, a subscription agreement and various other documentation. The check was to be made out to "TDIC Escrow Account." Close of the offering was to be December 21, 1985, unless, in the general partners discretion, the deadline was extended to January 21, 1986. General partners could purchase units on the same terms and conditions as limited partners. The promoters, the Debtor and McCall, would use their "best efforts" to sell at least fifty units in the limited partnership by the close of the offering period. If less than fifty units were sold, the offering would be cancelled and the purchase price returned.

The Debtor signed the following documents in his personal capacity, as a general partner, not as an agent for MMI. Plaintiff's Subscription Agreement, the Notice of Sale of Securities and Consent to Service of Process, Plaintiff's Offeree Questionnaire, the warehoused units sub-

scription agreement (both as subscriber and general partner), the Power of Attorney for the warehoused units and the Notice of Extension of Offering to February 21, 1986.

In spite of the detailed representations in the Memo, the reality of the situation differed. The actual closing date was postponed to February 21, 1986, a month beyond the represented extension date. Only thirty-two partnership units had been sold by February 21, 1986. Although less than fifty units had been sold, the purchase money was not returned to the investors. Instead, the Debtor and McCall each warehoused nine of the eighteen outstanding units with the intent to resell at a later date. Neither the Debtor nor McCall actually paid for the nine units or executed guaranties. Neither general partner made its capital contribution of $62,500.00. They did not disclose these facts to the Plaintiff, when he purchased on the last day of the offering. In addition, the fees paid for the thirty-two units were not deposited in an escrow account at Fourth National. Instead, the monies were deposited in a general account for TDIC at Western Bank. The money is no longer available to return to investors.

According to the Debtor's deposition testimony, he was familiar with the contents of the Memo, but he did not understand the legal terminology or technicalities. He relied upon the expertise of West and lawyer, Mike Carter. He was a TDIC promoter. He intended prospective purchasers to rely upon the information presented in the Memo. He was the president director and sole shareholder of MMI. He was always in control of the actions taken and decisions made by MMI. He failed to pay $12,500.00 for each warehoused unit or execute the guaranties. He never intended to be out of pocket for their purchase. He could not have afforded such a purchase. He relied on West's assertions that warehousing was the course to take. He believed West paid MMI's capital contribution. Carter did not inform him the minimum fifty units had not been sold. Finally, Debtor believed he was signing all the documents on behalf of the general partner, MMI, not as the general partner personally.

ARGUMENTS AND ANALYSIS

■ 11 U.S.C. § 523(a)(2)(B) which states in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ...

The elements of a § 523(a)(2)(B) action are clear from the statute and are not necessary to repeat. For summary judgment, the Plaintiff must prove from the evidence each element. The Court applies the law to the aforementioned facts.

The Debtor circulated a Memo to potential investors, including the Plaintiff, which was materially false. As previously discussed, reality did not match the representations in the Memo. Most important and most notable were those misrepresentations concerning money. For instance, no escrow account was set up for deposit of investor money. Eighteen units were warehoused by general partners under terms different from limited partners, i.e. the general partners did not pay $12,500.00 per unit, nor provide $75,000.00 guaranties. Cancellation of the offering did not occur when less than fifty units were sold; the investment money was not returned. In addition, the promised TDIC capitalization of $62,500.00 from each general partner was not made. The Memo concerned the alleged financial condition of the general partners, MMI and McCall Management, Inc. The Debtor, as an officer, director and sole shareholder of MMI, was an insid-

er. He solicited the purchase of partnership units and signed several documents in connection with the sale of Plaintiff's unit as a general partner, in his personal capacity, not on behalf of MMI.

 The Debtor intended the Plaintiff and other potential investors rely on the representations in the Memo. His assertions that he did not fully understand the contents of the Memo are of no avail. The Debtor intended others rely on the Memo and whether he understood the Memo or not, is not relevant. By causing the Memo to be prepared and circulating it with the intent others rely on it in making investment decisions, he became responsible for the veracity of its contents.

The Plaintiff reasonably relied on the representations in the Memo, with the exception being the references to the closing date to be no later than January 21, 1986. The Plaintiff purchased his unit on February 21, 1986; thus he had to have known the January 21, 1986 date was incorrect. The incorrect closing date, however, is a very minor infraction among more weighty misrepresentations.

Because the Debtor caused to be made and published the representations in the Memo, and was instrumental in distributing copies to potential investors with the intent others rely upon the representations therein, the Court infers the Debtor caused the Memo to be made and published with the intent to deceive those who received copies in the course of soliciting their investment. At the very least, the Debtor showed a reckless disregard for the truth or falsity of the Memo. *In re Liming,* 797 F.2d 895 (10th Cir.1986); *Brigadier Homes v. Hert,* 81 B.R. 638 (Bankr.N.D.Fla.1987); *In re Wing,* 96 B.R. 369 (Bankr.M.D.Fla. 1989).[1]

11 U.S.C. § 523(a) states:

A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—
(4) for fraud or defalcation while acting in a fiduciary capacity ...

 To find nondischargeability under this section, a fiduciary relationship must arise before the commitment of the fraudulent acts. *David v. Aetna Acceptance Corp.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1931); *In re Romero,* 535 F.2d 618 (10th Cir.1976). The elements necessary are an intent to create a trust, an identifiable trust res and trust duties. *In re Mailath,* 108 B.R. 290 (Bankr.N.D.Okla.1989).

 In this case, the fiduciary relationship arose between the parties when they entered into the subscription agreement pursuant to the terms presented in the Memo. The Debtor breached his fiduciary duty to the Plaintiff when the trust duties as presented in the Memo were not kept. The trust res was clearly described in the Memo as the funds collected from the Plaintiff when he purchased his unit. These funds should have been deposited in an escrow account at Fourth National, but were, instead, deposited at Western Bank in a TDIC general account.

This was no arms length transaction. If the venture succeeded, the Debtor stood to gain monetarily by virtue of his position as a general partner in MMI, as a joint venturer in the Harvard Joint Venture, as a partner in the Medical Group and as the controlling officer, director and sole shareholder of MMI, the purported general partner. The Plaintiff was aware of these connections as stated in the Memo, but was unaware of the misrepresentations until it was too late to decide not to invest. The Debtor had a duty to not only deal honestly with the Plaintiff, but also to care for his investments. The Debtor's defense is that MMI, a corporation, was the general partner of TDIC; thus, corporate law principles protect him from individual liability. The

---

**1.** As this Opinion was being written, the Tenth Circuit in *Mill Creek Lumber & Supply Co. v. Stripling (In re Stripling),* 947 F.2d 954 (Sept. 4, 1991), unpublished, affirmed the decision of the District Court for the Northern District, affirming Judge Mickey D. Wilson's decision of non-

dischargeability under 11 U.S.C. § 727(a)(2) and (3). Similarly, the debtors' defense had been her naivete concerning the business side of her medical practice, his poor judgment and errors by their accountant and attorney.

Court, however, will not allow the Debtor to hide beneath a corporate shell when he so completely controlled the corporate actions, representations and decisions that in effect it had no life without him.

WHEREFORE, IT IS ORDERED ADJUDGED AND DECREED that the Plaintiff has established all the elements necessary under 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(4) for nondischargeability. Debtor's objection to Plaintiff is found to be nondischargeable. Summary judgment is granted in favor of the Plaintiff. A separate order consistent with this Memorandum Opinion shall be entered.