**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 5, 2011

No. 10-40406

Lyle W. Cayce
Clerk

In the Matter of: DAVID S. HARWOOD,

Debtor

------------------------------------------------------------------------

FNFS, LTD; B & W FINANCE CO., INC.,

Appellees

v.

DAVID S. HARWOOD,

Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, DAVIS, and SOUTHWICK, Circuit Judges.

KING, Circuit Judge:

David S. Harwood, a Chapter 7 debtor, appeals the district court's order affirming the bankruptcy court's ruling that certain of his debts are nondischargeable under 11 U.S.C. § 523(a)(4). He challenges the bankruptcy court's determination that his debts—loans obtained from a limited partnership that Harwood managed in his capacity as officer and director of the partnership's corporate general partner—were incurred through defalcation while acting as a fiduciary to the partnership. Because we agree that Harwood

No. 10-40406

wilfully neglected a duty owed to the partnership in connection with the loans, we affirm the judgment of the district court affirming the judgment of the bankruptcy court.

## I. BACKGROUND

The parties do not challenge the bankruptcy court's findings of fact, which are based on evidence presented during a bench trial before that court and set forth in the bankruptcy court's thorough amended memorandum of decision. *See FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366 (Bankr. E.D. Tex. 2009). We summarize the relevant facts here, providing greater detail as relevant to our analysis of the issues presented in this appeal.

In 1991, Harwood, along with Wayne McKinney, purchased B & W Finance, a consumer lending business. In 1996, B & W Finance reorganized into a Texas limited partnership, FNFS, Ltd. ("FNFS"). All consumer lending operations were transferred into FNFS. A newly-created subchapter S corporation, B & W Finance Co., Inc. ("B & W"), served as the sole general partner of FNFS. McKinney and Harwood each owned 50% of the issued and outstanding stock of B & W, which in turn owned a 51% partnership interest in FNFS. Twenty-five limited partners owned the remaining 49% percent of partnership interests in FNFS.

Harwood served as president, chief operating officer, and a director of B & W, and McKinney served as its chief executive officer and chairman of the board. While McKinney brought substantial financial resources to the enterprise, but no particular banking expertise, Harwood brought his extensive experience in the banking and lending industry. Harwood managed the day-to-day business affairs of B & W, which provided executive and managerial support to FNFS and which, pursuant to FNFS' partnership agreement, exercised "full, sole, exclusive, and complete discretion in the management and control of the business, operations, and affairs of [FNFS]." Based on evidence

2

No. 10-40406

adduced at trial, the bankruptcy court found that Harwood "exercised virtually all executive power over FNFS operations on a daily basis" in what the court described as "an almost autocratic fashion." *Harwood*, 404 B.R. at 378, 397.

Early on in his tenure as president of B & W, Harwood began withdrawing funds from FNFS for his personal use, including a $200,000 loan in 1997 to finance construction of a large steel-frame gymnasium on his property in Arp, Texas (the "Arp property"). In 1998, Harwood memorialized these loans in two promissory notes to FNFS—a $700,000 "Master Note" accompanied by a deed of trust in favor of FNFS on the Arp property, and a $125,000 note (the "Frazier Note") secured by a second-lien deed of trust in favor of FNFS on a residential rental property on East Frazier Street in Tyler, Texas (the "Frazier property"). Harwood prepared and signed the Notes and security documents, which he kept in a personal "loan file" in a desk drawer in his office. He never filed the deeds of trust with the county clerk.

Between 1998 and 2005, Harwood received a total of seventy-three advances on the Notes, using the funds for various personal expenditures, including a down payment on a family home and a new car.[1] Harwood made only intermittent interest payments to FNFS, which were due quarterly under the terms of the Notes. On several occasions he borrowed funds from FNFS for the purpose of making interest payments on the Notes. The bankruptcy court found that, although the FNFS employee handbook outlined policies and procedures governing employee loans, Harwood followed no formal procedure for borrowing funds from FNFS. According to the bankruptcy court, Harwood

---

[1] Harwood also extracted other financial benefits from FNFS and B & W. The bankruptcy court found that Harwood placed his now ex-wife, Sherry Harwood, on the B & W payroll, although she performed no work for the company; that Harwood used the company's airplane for personal trips at the company's expense; that he used a corporate credit card for personal expenses, expending little effort to identify and reimburse B & W for those expenses; and that he demanded, and received, reimbursement for purported business expenses without providing any documentation to support his demands.

3

exceeded any purported debt ceiling "with impunity," issuing additional notes to FNFS when the aggregate amount of his indebtedness exceeded the amount of the Master Note. *Id.* at 380. The Master Note was then "extended and renewed" to incorporate the additional advances. *Id.*

Although the B & W board of directors routinely approved employee loans, including Harwood's, the testimony at trial established that the board was only generally aware of Harwood's growing indebtedness to FNFS and the fact that Harwood did not make any significant effort to pay down the principal amount of the Notes. The board apparently believed the Notes to be sufficiently collateralized, and McKinney orally assured the board that he would personally cover any losses to the limited partners in the event that Harwood failed to repay his debts to the partnership.

A confluence of events—including growing annual losses to the consumer lending business, McKinney's death in September 2004, and the company's struggle to maintain net capital reserves for each of its lending branches in compliance with state regulations—caused the board to pay closer attention to the financial health of the enterprise. The board formed an audit committee in 2004, which discovered, among other things, that Harwood had failed to record the deeds of trust that he had executed in favor of FNFS as security for the Master Note and the Frazier Note, leaving the partnership with an unperfected interest in the pledged collateral. Worse still, Harwood had subsequently pledged the Arp property as collateral for two other promissory notes from Hibernia National Bank.

The Board ultimately terminated Harwood's employment as president and chief operating officer of B & W in April 2005, following a dispute with Harwood regarding Harwood's unauthorized and ultimately unprofitable efforts to expand the business and his failure to produce a repayment plan on his loans. By the

No. 10-40406

end of 2004, the combined unpaid principal balance of the Notes was at least $843,969.73, with at least $71,802.79 in accrued but unpaid interest.

B & W and FNFS brought suit against Harwood on June 7, 2005. On June 15, 2005, Harwood filed a voluntary Chapter 7 bankruptcy petition. B & W and FNFS initiated the instant adversary proceeding to challenge Harwood's entitlement to a discharge of any of his debts under Section 727(a) of the Bankruptcy Code or, alternatively, to determine whether certain debts owed to them were nondischargeable under Sections 523(a)(2)(A) and (B), 523(a)(4), and 523(a)(6). B & W sought a nondischargeability determination as to certain travel expense reimbursements, charges to a corporate credit card, and payroll payments to Harwood's ex-wife Sherry Harwood. FNFS sought a determination of the nondischargeability of the outstanding principal amount of the Master Note and Frazier Note, plus accrued interest, as well as personal expenses on a corporate credit card and rental sums FNFS paid to Harwood to use the Arp property, at Harwood's urging, for employee retreats.

The bankruptcy court held that Section 523(a)(4)'s exception to discharge for debts arising from "defalcation while acting in a fiduciary capacity" applied to B & W's claim for payroll payments to Sherry Harwood, and to Harwood's remaining indebtedness to FNFS on the Master Note and the Frazier Note. The bankruptcy court held that B & W and FNFS did not carry their burden of proving that any of the other urged exceptions to discharge applied. Harwood appealed only the determination that the Notes were nondischargeable under Section 523(a)(4).[2] The district court affirmed, and Harwood timely appealed to this court.

_____

[2] FNFS cross-appealed the bankruptcy court's ruling that it failed to prove that the remaining indebtedness on the Notes are nondischargeable under Sections 523(a)(2) and 523(a)(6). The district court did not reach the cross-appeal issues, affirming the bankruptcy court's judgment that Harwood's remaining indebtedness on the Notes is nondischargeable under § 523(a)(4).

No. 10-40406

## II.  STANDARD OF REVIEW

We review the bankruptcy court's conclusions of law *de novo* and its findings of facts for clear error.  *LSP Investment P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 781 (5th Cir. 1993).  Whether Harwood's actions amounted to a defalcation is a mixed question of law and fact that we review *de novo*.  *Id.* at 782 n.3; *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2000).

## III.  DISCUSSION

Section 523(a)(4) states in pertinent part:

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity

. . . .

11 U.S.C. § 523(a)(4).  This bar to discharge reaches "debts incurred through abuses of fiduciary positions . . .[and] involv[ing] debts arising from the debtor's acquisition or use of property that is not the debtor's." *Texas Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998) (citation and internal quotation marks omitted).  The party promoting the exception to discharge must prove by a preponderance of the evidence that the debt is nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).  Exceptions to discharge are strictly construed against the creditor and liberally construed in favor of the debtor. *Hudson v. Raggio (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

Harwood challenges the bankruptcy and district courts' conclusions that he "acted in a fiduciary capacity" toward FNFS within the meaning of Section 523(a)(4), and that his failure to record the deeds of trust amounted to defalcation.  We address these challenges in turn.

6

No. 10-40406

## A.   "Acting in a Fiduciary Capacity" under Section 523(a)(4)

Harwood first challenges the bankruptcy court's holding that he was "acting in a fiduciary capacity" within the meaning of Section 523(a)(4). The term "fiduciary" in this context is construed narrowly, limited to "technical trusts" and to traditional fiduciary relationships involving "trust-type" obligations imposed by statute or common law. *Bennett*, 989 F.2d at 784–85. "The scope of the concept of fiduciary under [Section 523(a)(4)] is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *Bennett*, 989 F.3d at 784 (citation omitted).

Harwood readily concedes that, as an officer and director of B & W, he owed a fiduciary duty to B & W. Under Texas law, corporate officers and directors owe fiduciary duties to the corporations they serve and must not allow their personal interests to prevail over the interests of the corporation. *See, e.g., Pinnacle Data Servs., Inc. v. Gillen*, 104 S.W.3d 188, 198 (Tex. App.–Texarkana, 2003, no pet.) (citations omitted); *see also Moreno v. Ashworth*, 892 F.2d 417, 421 (5th Cir. 1990) (officer owed a fiduciary duty to the corporation he served that satisfied Section 523(a)(4)). Nor is it disputed that, under Texas law, B & W, as general partner of FNFS, owes a fiduciary duty to FNFS and to the limited partners.[3] *See, e.g., Grierson v. Parker Energy Partners*, 737 S.W.2d 375, 377 (Tex. App.–Houston [14th Dist.] 1987) (citation omitted); *see also Bennett*, 989

---

[3] Although this point is not disputed in this case, we note that, since *Bennett*, we have called into question whether partners owe fiduciary duties to their co-partners under Texas law that satisfy the narrow construction of Section 523(a)(4), based a provision of the Texas Revised Partnership Act stating that partners are not to be held to a trustee standard. *See Gupta v. Eastern Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347, 351 (5th Cir. 2004) (citing Tex.Rev.Civ. Stat. Ann. art. 6132b-4.04(f) (expired Jan. 1, 2010) ("A partner, in that capacity, is not a trustee and is not held to the same standards as a trustee.")); *see also* Tex. Bus. Orgs. Code, § 152.204(d). We have nonetheless continued to state as a general rule that general partners owe fiduciary duties to the partnerships and the limited partners they serve, and that these duties are "trust-like." *See McBeth v. Carpenter*, 565 F.3d 171, 177 (5th Cir. 2009) (discussed below).

No. 10-40406

F.2d at 787 ("Texas law clearly and expressly imposes trust obligations on managing partners of limited partnerships and these obligations are sufficient to meet the narrow requirements of section 523(a)(4)."). Harwood contends, however, that although he owed a fiduciary duty to B & W, which in turn owed a duty to FNFS, *he* owed no fiduciary duty to FNFS because he was not a partner of the limited partnership and did not exercise a level of control over the affairs of the partnership to justify the recognition of fiduciary obligations owing to FNFS. Thus, we consider whether Texas law imposes a "trust-type obligation" on Harwood to the limited partnership, where Harwood was an officer and director, as well as 50% shareholder, of the corporate general partner of the limited partnership.

In *LSP Investment Partnership v. Bennett (In re Bennett),* we considered an analogous issue: whether a debtor—-the managing partner of a general partner of a Texas limited partnership—owed a fiduciary duty to the limited partners within the meaning of Bankruptcy Code Section 523(a)(4). To determine whether Texas law recognizes a fiduciary duty owed by a second-tier managing partner in a two-tiered partnership structure, we relied largely on *Crenshaw v. Swenson*, 611 S.W.2d 886 (Tex. Civ. App.–Austin 1980, writ ref'd n.r.e.). In *Crenshaw*, the Texas court held that a managing partner of a partnership's general partner owed to the underlying partners "the highest fiduciary duty recognized in the law." 611 S.W.2d at 890 (citing *Huffington v. Upchurch*, 532 S.W.2d 576 (Tex. 1976)). We found significant that the *Crenshaw* court "focused on the nature of the business relationship as a whole, in which one person . . . in her various roles . . . exercised almost complete control over" the business of the partnership in concluding that the second-tier managing partner owed a duty to the underlying partners. *Id*. at 789. We noted that, under Texas law, "the issue of control has always been the critical fact looked to by the courts" in determining whether to impose fiduciary responsibilities on

8

No. 10-40406

individuals whose actions directly determine the conduct of a general partner of a limited partnership. *Bennett*, 989 F.2d at 789.

In *Bennett*, the debtor was the sole general partner of a general partner charged with the exclusive authority to manage and make all decisions relating to the underlying partnership. *See id.* at 781. As a result, Bennett, individually, and through a corporation that he owned which he hired to manage the partnership, had the exclusive power and authority to manage the affairs of both the general partner and the limited partnership. *Id.* at 781. We concluded that by virtue of this control, Bennett was a fiduciary of the underlying partnership under Texas law, overturning the bankruptcy court's ruling that the partnership's multi-tiered partnership structure shielded Bennett from personal liability to the partnership for misapplication of partnership funds. *Id.* at 790. We further held that Bennett's fiduciary obligations to the partnership sufficed to make Bennett a "fiduciary" within the meaning of Section 523(a)(4), finding that Texas law imposes on managing partners in a position of control over the partnership a duty analogous to that owed by a trustee to the beneficiaries of the trust. *Id.* at 790 (citations omitted).

The bankruptcy court in the instant case noted that it found no controlling authority precisely on point concerning the duty of an operational officer of a corporate general partner toward a limited partnership. However, it found the *Bennett* court's analysis—that the actual degree of authority exercised over the limited partnership is relevant to determining whether a second-tier manager owes a duty to the limited partnership—equally applicable to a corporate officer who controls a limited partnership by virtue of his control over the corporate general partner. "The relevant issue should not be the choice of organizational form . . . but rather an analysis of whether the degree of control actually exercised by a corporate officer over the actions of a corporate general partner warrants a corresponding recognition" that the officer has assumed

9

responsibilities to the limited partnership. *Harwood*, 404 B.R. at 397; *see also Park v. Moorad* 132 B.R. 58, 63 (Bankr. N.D. Okl. 1991) (officer and sole shareholder of a general partner was a fiduciary of the underlying partnership for purposes of Section 523(a)(4), stating that the court would "not allow the Debtor to hide beneath a corporate shell when he so completely controlled the corporate actions, representations and decisions that in effect it had no life without him").

We have since decided *McBeth v. Carpenter*, 565 F.3d 171 (5th Cir. 2009), in which we addressed, in a non-bankruptcy context, the duties owed by an officer to a subsidiary entity that the officer controlled. In *McBeth*, we noted as a general principle that "managing partners owe trust obligations to the partnership, having a duty of loyalty and due care as well as being under an obligation to discharge their duties in good faith and in the reasonable belief that they are acting in the best interest of the partnership." *Id*. at 177 (citing Tex. Rev. Civ. Stat. Art. 6132b–4.04(b)–(d)). We held that Texas law imposes the same fiduciary obligations on the president of a corporate general partner to the limited partners, where the president, Carpenter, was in a position of control over the partnership by virtue of his control over the partnership's corporate general partner. *Id*. at 178. The partnership agreement entrusted in the president the "exclusive rights to manage all contracts and agreements" relating to the purchase and development of land, the purpose for which the partnership was created. *Id*. Carpenter was described as "the man in control" and the one "heading the efforts" of the partnership, and acted as—and indeed held himself out to others as being—the general partner of the partnership. *Id*. Carpenter also controlled two of the partnership's limited partners. *Id*. at 175. Citing to *Bennett* and *Crenshaw*, we held that his control over the direction of the partnership sufficed to find him a fiduciary of the partnership under Texas law. *Id*. at 178.

No. 10-40406

We conclude that an officer of a corporate general partner who is entrusted with the management of the limited partnership and who exercises control over the limited partnership in a fashion analogous to *Bennett* and *McBeth* owes a fiduciary duty to the partnership that satisfies Section 523(a)(4). We emphasize that it is not only the control that the officer actually exerts over the partnership, but also the confidence and trust placed in the hands of the controlling officer, that leads us to find that a fiduciary relationship exists sufficient for the purposes of Section 523(a)(4).

With this background, we focus our analysis on whether Harwood exercised a similar degree of control over FNFS as was sufficient to find a fiduciary duty in *McBeth* and *Bennett*. In determining whether Harwood owed a fiduciary duty to both tiers of the organization, we "focus[ ] on the nature of the business relationship as a whole." *Bennett*, 989 F.2d at 789.

We first reject Harwood's contention that the bankruptcy court improperly relied on Harwood's drafting of, and ability to draw upon, the Master Note at will as evidence of his control, and that insufficient evidence was presented at trial to establish his level of control over FNFS prior to and apart from obtaining the loans. He correctly argues that, to establish that a debtor acted "in a fiduciary capacity" under 523(a)(4), the trust-type relationship must exist "prior to the act creating the debt and without reference to that act" to satisfy Section 523(a)(4). *See Bennett*, 989 F.2d at 784. Therefore, under Section 523(a)(4), "[i]t is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*." *Gupta v. Eastern Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004) (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)).

However, we do not think that we are precluded from considering the circumstances surrounding the Notes as evidence of the level of control that Harwood exercised prior to and apart from his obtaining the loans. The relevant

case law does not purport to state an evidentiary rule; it merely limits the applicability of the Section 523(a)(4) exception to discharge to those "debts incurred through abuses of fiduciary positions." *Tran*, 151 F.3d at 342.  Thus, we are required to find a fiduciary duty owed by Harwood to FNFS that is separate and apart from the loans—that is, FNFS cannot rely on a constructive trust, which is remedial in nature and which arises only after the wrongdoing, to satisfy the fiduciary capacity element of Section 523(a)(4).

In this case, the bankruptcy court found that Harwood's control over FNFS enabled him to execute the Notes at issue and draw upon them at will —it did not hold that a trust relationship would be imposed *because of* the Notes.  In any event, as discussed below, the bankruptcy court did not rely on Harwood's ability to raid FNFS' coffers to find a pre-existing fiduciary relationship; it found that Harwood exercised managerial control over FNFS from the inception of the partnership, a fact finding that is not clearly erroneous.

Harwood also contends that the evidence does not establish that he exercised the level and kind of control over FNFS sufficient to be considered a fiduciary of FNFS under the relevant case law, pointing out that he was but one director among many, and a non-controlling shareholder.  He maintains that that the board could and did limit his authority to manage B & W and obtain loans from FNFS towards the end of his tenure at B & W.  He also points out that, in fact, the board ultimately terminated his employment—further evidence of his lack of control over B & W, and consequently, FNFS.

To the contrary, the facts found by the bankruptcy court amply establish that Harwood exercised near-complete control over both tiers of the entity until a few months prior to his termination.  Although B & W as an entity was tasked with the management of FNFS pursuant to FNFS' partnership agreement, the bankruptcy court found that the B & W board entrusted Harwood with the sole and plenary authority over the day-to-day management of the partnership

enterprise. The board paid little attention to the day-to-day operations of FNFS, and McKinney, the other managing shareholder and chief executive officer of B & W, was not able to exercise meaningful oversight because had no particular banking expertise. Although Harwood's authority was subject to the board's oversight, the bankruptcy court found that the board placed no actual limits on Harwood's management of FNFS until 2004.[4] The board of directors apparently rubber-stamped Harwood's advances on the FNFS Master Note based on the incomplete disclosures that Harwood made to the board, and the bankruptcy court found "little evidence to suggest that any person with actual authority at B & W or FNFS ever became concerned about the rising amount of the Harwood indebtedness prior to September 2004." *Id.* at 380.

With this significant degree of trust placed on Harwood over the management of the partnership and partnership funds, Harwood exercised "virtually all executive power over FNFS operations on a daily basis." *Id.* at 378. Harwood, as president and chief operating officer of B & W,

> planned and supervised the growth and expansion of the FNFS lending locations. He controlled the hiring, evaluation, promotion, and termination of FNFS employees, the number of which soon exceeded 100 at 25 B & W Finance locations. No one with daily

---

[4] For this reason, we reject Harwood's efforts to distinguish *Bennett* on the basis that the managing partner in *Bennett*, by virtue of being a partner rather than an officer of a corporation, was not subject to any oversight or limits on authority analogous to that exerted by a board of directors. Similarly, we do not think that *Park* and *McBeth* are distinguishable on the basis that they involve officers who were also the sole shareholder or director of the corporate general partner, where Harwood was not. The fact that Harwood was not a majority shareholder, and one of several directors of B & W, did not appear to limit his control over the management of the partnership in any meaningful way; in fact, based on testimony at trial, the bankruptcy court found that because Harwood was one of two shareholders of the privately-held subchapter S corporation, the board gave little attention to the day-to-day operations of the business or what perks were provided to corporate officers. *See Harwood*, 404 B.R. at 380. We also reject Harwood's contention that the fact that the board eventually exercised its authority and terminated his employment conclusively establishes his lack of actual managerial control over the partnership during the overwhelming portion of his tenure at B & W.

> involvement in the company's affairs could challenge Harwood's authority or decision-making. He managed all FNFS operations from the central office in Tyler[, Texas].

*Id.* at 378. The bankruptcy court also found that Harwood held himself out as the "president" of FNFS, "which, while not technically accurate, was practically true in every sense." *Id.* Moreover, Harwood exercised substantial control over B & W and partnership funds. Harwood made oral demands for advances on the Master Note, as well as for reimbursements for undocumented business expenses, which Harwood's subordinates processed without question. "The only governing policy was to do what Harwood directed." *Id.* at 380 n.23.

We agree with the bankruptcy and district courts that the board's entrustment in Harwood of the management of the partnership's affairs and the partners' investments, when combined with the practically complete control that Harwood actually exercised over the partnership's management, compels a conclusion that Harwood stood "in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of the trust." *McBeth*, 565 F.3d at 177 (quoting *Crenshaw*, 611 S.W.2d at 890). In the circumstances of this case, we find that Harwood acted "in a fiduciary capacity" to FNFS within the meaning of Section 523(a)(4).

## B.   Defalcation under Section 523(a)(4)

Harwood also challenges the bankruptcy court's conclusion that his failure to record the deeds of trust securing the Master Note and Frazier Note constituted defalcation. "Defalcation" for the purposes of Section 523(a)(4) "is a willful neglect of duty, even if not accompanied by fraud or embezzlement." *Moreno*, 892 F.2d at 421. Willful neglect "does not require actual intent, as does fraud," and is "essentially a recklessness standard." *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185 (5th Cir. 1997). Willfulness in this context "is measured objectively by reference to what a reasonable person in the debtor's

position knew or reasonably should have known." *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001).

The bankruptcy court held that B & W and FNFS failed to establish that Harwood's making of the loans to himself constituted a willful neglect of duty, noting that the loans were not made surreptitiously, and that the board was at least generally aware of and approved their existence. *Harwood*, 404 B.R. at 398. The bankruptcy court suggested that Harwood's failure to maintain a manageable debt ceiling "could be deemed a credible consideration in determining whether his actions or omissions rise to the level of a defalcation," but held that B & W and FNFS' evidence on this point "establishes a level of culpability by Harwood no greater than negligence," which the court held to be insufficient to establish a defalcation. *Id.* at 398–99 (citing *Meyer v. Rigdon*, 36 F.3d 1375, 1384–85 (7th Cir. 1994) and *FDIC v. Gaubert (In re Gaubert)*, 149 B.R. 819, 827 (Bankr. E.D. Tex. 1992)). The bankruptcy court held, however, that "[i]n light of his fiduciary duty to protect FNFS from financial harm, and in light of his knowledge that he would personally benefit from any failure of recordation, Harwood's failure to ensure the proper recordation of the deeds of trust constituted a willful neglect of his duty to FNFS" and therefore his remaining indebtedness to FNFS on the Master Note and Frazier Note is nondischargeable. *Id.* at 399.

Supporting its holding, the bankruptcy court found that Harwood was aware that McKinney—who Harwood contends was charged with the responsibility of recording the liens—had no banking expertise and "no particular knowledge regarding sound lending practices." *Id.* In contrast, the bankruptcy court found that Harwood was a sophisticated banker who "absolutely knew the ramifications of any failure to properly record a deed of trust on real property under Texas law," and also knew what actions had to be taken "in order to ensure that FNFS held a rightful first-lien position as to the

collateralized properties, thereby preserving, at the very least, a degree of protection for FNFS in the face of increasing economic difficulties and increasing note balances." *Id.*

Furthermore, the bankruptcy court found that Harwood was aware that FNFS' failure to properly record the deeds of trust worked to his benefit, as it allowed him to pledge the unencumbered collateral to procure additional funds. After Harwood executed the deed of trust granting a lien on the Arp property in FNFS' favor to secure the Master Note, Harwood signed deeds of trust granting liens on the Arp property for the benefit of Hibernia National Bank, securing two promissory notes with a combined total of $499,402. Unlike the FNFS' liens on the Arp property, the Hibernia National Bank liens were properly recorded. As a result, Hibernia National Bank held a senior secured position on the Arp property.[5]

The bankruptcy court also found that Harwood "absolutely knew or had reason to know the devastating effect which [a failure to ensure recordation of the deed of trust liens] would have on any subsequent collection effort by FNFS, and that such a risk to FNFS grew in proportion to the escalating balance of the sums that he personally borrowed from that entity." *Id.* And indeed, Harwood's failure to record the deeds of trust complicated FNFS' recovery on the Notes. For instance, FNFS recorded the deed of trust on the Frazier property in January 2005, but because the recordation occurred within one year of the filing of Harwood's bankruptcy petition, the Chapter 7 trustee commenced a proceeding to avoid the recordation as a preferential transfer under 11 U.S.C.

---

[5] In 2001, Harwood pledged his B & W stock as replacement collateral for the Master Note. However, the bankruptcy court found that the stock certificates were not placed in the loan file with the loan documents, and, indeed, were never found. *Harwood*, 404 B.R. at 381–82. B & W reissued the certificates in 2004 after the audit committee discovered the loan file and the absence of the certificates. The stock was ultimately sold and its proceeds applied to the accrued interest and principal amount owing on the Notes.

§ 547. FNFS ultimately settled with the trustee for less than what the partnership would have received had Harwood recorded the deed of trust soon after executing the Note.

Harwood does not challenge the bankruptcy court's factual findings, and we do not find them to be clearly erroneous. Harwood argues, however, if the taking of the loans themselves does not constitute defalcation, then he cannot be denied a discharge for taking additional, yet incomplete steps to secure the loans for the benefit of FNFS. The district court rejected this argument, finding that Harwood's duty to protect FNFS from financial harm "included properly securing the more than $800,000 in personal loans he withdrew in FNFS funds," and that "Harwood is not redeemed by making it halfway to the goal." *Harwood v. FNFS, Ltd. (In re Harwood)*, 427 B.R. 392, 398 (E.D. Tex. 2010).

We likewise find that Harwood's half-measures with regard to securing the loans constitutes willful neglect of his duties to FNFS. A fiduciary "is not permitted to place himself in a position where it would be for his own benefit to violate" his duty to administer the partnership affairs solely for the benefit of the partnership. *Crenshaw*, 611 S.W.2d at 890; *cf. Moreno*, 892 F.2d at 421 (citations omitted) (and officer's duty "encompasse[s], at least, a responsibility not to lend [the corporation's] money to himself or corporations controlled by him on less than an arms-length basis"). Even if the existence of the loans themselves was not a defalcation, the bankruptcy court did not err in further concluding that Harwood recklessly breached his duty to FNFS by failing to protect against the increasing financial risk created by those loans by ensuring that FNFS perfected its lien on the pledged collateral, particularly where his failure accrued to his benefit. Accordingly, the district court did not err in holding that the bankruptcy court properly found Harwood's remaining indebtedness on the Notes to be nondischargeable under Section 523(a)(4).

No. 10-40406

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court affirming the bankruptcy court's judgment.