IN RE: Roy DIXON, Jr., Debtor.

General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit and The Board of Trustees of the City of Pontiac General Employees Retirement System, Plaintiffs,

v.

Roy Dixon, Jr., Defendant.

CASE NO. 11–75482–WLH
ADV. NO. 12–5222

United States Bankruptcy Court,
N.D. Georgia, Atlanta Division.

Signed February 10, 2015

Jordan S. Bolton, Peter Jackson, Clark Hill PLC, Peter A. Jackson, Detroit, MI, Darryl S. Laddin, Arnall Golden Gregory LLP, Atlanta, GA, Cynthia J. Billings, Wallace M. Handler, Sullivan, Ward, Asher & Patton, P.C., Southfield, MI, for Plaintiff.

Roy Dixon, Jr., Atlanta, GA, pro se.

## ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Wendy L. Hagenau, U.S. Bankruptcy Court Judge

This non-dischargeability action arises out of Roy Dixon's ("Debtor") relationship with three pension funds: General Retirement System of the City of Detroit ("Detroit GRS"), Police and Fire Retirement System of the City of Detroit ("Detroit PFRS"), and the Board of Trustees of the City of Pontiac General Employees Retirement System ("PGERS"). These three funds (collectively the "Plaintiffs") invested over $22 million in a limited partnership operated by the Debtor, the vast majority of which was lost. Plaintiffs seek partial summary judgment under 11 U.S.C. § 523(a)(2)(A) and (a)(4). This Court has jurisdiction over this dischargeability cause of action under 28 U.S.C. § 1334 and the matter is core under 28 U.S.C. § 157(b)(2)(I).

All three Plaintiffs move for partial summary judgment ("Motion") under Count I (breach of duties of loyalty and care constituting fraud or defalcation while acting in a fiduciary capacity) and/or Count III (false pretenses, false representations or actual fraud) of the Plaintiffs' First Amended Complaint. Alternatively, PGERS moves for summary judgment in its favor alone under Count III. Plaintiffs reserved their claims under the remaining counts of the Amended Complaint as well as for sums in excess of $16,010,958 under Counts I and III.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The substantive law [applicable to the case] will identify which facts are material". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 251–52, 106 S.Ct. 2505. The party moving for summary judgment has "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir.1991) (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993). Lastly, when reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. *Id.*

## SOURCE OF UNDISPUTED FACTS

The undisputed facts in this case are provided by three sources. First, the Debtor admitted certain facts in his Answer to the Plaintiffs' Amended Complaint, and in his response to the Plaintiffs' Statement of Material Facts. Second, the Court entered an order on August 6, 2013 [Docket No. 62] holding that the Debtor was deemed to have admitted all the matters raised in PGERS's Second Request for Admissions ("PGERS' Admissions"), Detroit GRS's First Request for Admissions ("DGRS' Admissions"), and Detroit PFRS's First Request for Admissions ("DPFRS' Admissions"). The Requests for Admission are attached as Exhibits 3, 4 and 5 to the Plaintiffs' Brief in support of its Motion ("Brief"). The Court's Order of August 6, 2013 was entered pursuant to Fed. R. Bankr. P. 7036(a)(3) which provides that, "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." The Rule further provides, "A matter admitted under this Rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Bankr. P. 7036(b). Such an ad-

mission is only for purposes of this adversary proceeding and "cannot be used against the party in any other proceeding." *Id.*

The third source for undisputed facts is the order in a proceeding styled *United States Securities and Exchange Commission v. Onyx Capital Advisors LLC, Roy A. Dixon and Michael A. Farr,* 2012 WL 4849890, at *1 (E.D.Mich. Oct. 11, 2012) ("District Court Order" or "District Court Action"). There, certain of the issues raised by the Plaintiffs in their Motion have already been decided adversely to the Debtor. As such, the doctrine of collateral estoppel applies. The District Court Order is attached to Plaintiffs' Brief as Exhibit 24. In it, the District Court, in addition to other matters, granted the Securities & Exchange Commission's ("SEC") motion for summary judgment against Debtor and Onyx Capital Advisors, LLC ("OCA") on the SEC's claims that Debtor and OCA violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 of Section 10(b) (collectively referred to as the "Securities Anti–Fraud Provisions") and Sections 206(1) and 206(2) of the Investment Advisers Act ("IAA"). The court held that, to establish violations of the Securities Anti–Fraud Provisions, "the SEC must show that the defendants engaged in: 1) misrepresentations or omissions of a material fact 2) made in connection with the offer, sale or purchase of securities 3) with *scienter* on the part of the defendants." To establish a violation of the IAA requires the Court to find that the Debtor and OCA, as investment advisers, employed a device, scheme or artifice to defraud or participated in a transaction, course of business or practice which operates as a fraud or deceit. The court ruled in favor of the SEC on all claims and issued a permanent injunction against both Debtor and OCA prohibiting future violations of the securities laws and ordering disgorgement of $3,112,343. The District Court also reserved the right of the SEC to submit further documentation seeking civil penalties.

■■■ Upon review of the District Court Order, this Court asked the parties for additional briefing on the collateral estoppel effect of the District Court Order on Plaintiffs' Motion. All parties submitted additional briefing on the issue. Collateral estoppel is also known as issue preclusion. The Eleventh Circuit has articulated the standard for issue preclusion as follows:

> To claim the benefit of collateral estoppel the party relying on the doctrine must show that: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Christo v. Padgett,* 223 F.3d 1324, 1339 (11th Cir.2000) (citation omitted). The U.S. Supreme Court in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), explored the right of a party to use offensive collateral estoppel such as is sought here. In *Parklane,* shareholders brought suit against a corporation and its officers and directors, and asserted collateral estoppel as to issues decided in a prior SEC action against those same defendants. As the Supreme Court defined the issue,

> The threshold question to be considered is whether ... the petitioners can be precluded from re-litigating facts re-

solved adversely to them in a prior equitable proceeding with another party under the general law of collateral estoppel. Specifically, we must determine whether a litigant who was not a party to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from relitigating issues resolved in the earlier proceeding.

*Id.* at 326, 99 S.Ct. 645. In *Parklane,* the court rejected a requirement of mutuality, i.e., that only the same parties to the prior litigation could assert collateral estoppel. The Supreme Court "concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied." *Id.* at 331, 99 S.Ct. 645. Under the facts of *Parklane,* the court noted that the private plaintiff could probably not have joined with the SEC in its injunctive action. The court held further, "[I]n light of the serious allegations made in the SEC's complaint against the petitioners, as well as the foreseeability of subsequent private suits that typically follow a successful Government judgment, the petitioners had every incentive to litigate the SEC lawsuit fully and vigorously." *Id.* at 332, 99 S.Ct. 645. As a result, the Supreme Court held that private plaintiffs could use the results of a prior SEC enforcement action through collateral estoppel to support their case. It is also unquestioned that the doctrine of collateral estoppel applies in dischargeability actions in bankruptcy court. *See Grogan v. Garner,* 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *HSSM 7 Ltd. P'ship v. Bilzerian (In re Bilzerian),* 100 F.3d 886, 892 (11th Cir.1996); *JPI Partners, L.L.C. v. Dixon (In re Dixon),* 2006 WL 6589879, at *1–3 (Bankr.N.D.Ga. Sept. 26, 2006).

■ The first consideration in deciding whether the application of offensive collateral estoppel is appropriate is whether the issues in the prior litigation and the issues in the current litigation are identical. This question addresses "whether the issues presented by this litigation are in substance the same as those resolved [in the prior litigation]; whether controlling facts or legal principles have [not] changed significantly since the [prior litigation]; and finally whether special circumstances warrant exception to the normal rules of preclusion." *Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 801 (Bankr.E.D.N.Y.2014) (alteration in original) (citation omitted). The Court will examine the identity of the issues in the context of its discussion of the requirements of 11 U.S.C. § 523. The Court notes, however, that the controlling facts of this case have not changed since the District Court Order was entered. Further, the District Court Order was entered in October 2012 and no substantial changes have been made to the law of dischargeability or the Securities Anti–Fraud Provisions or the IAA since the District Court announced its conclusions. Finally, the Court finds no special circumstances that would warrant an exception to the normal rules of applying collateral estoppel.

■ The next requirement for applying collateral estoppel is whether the issues were actually litigated in the prior proceeding. The actually-litigated requirement "is satisfied where the issue was 'raised by the pleadings or otherwise placed in issue.'" *In re Birnbaum* 513 B.R. at 801 (citations omitted). "[A] full trial on the merits is not a prerequisite for collateral estoppel to apply." *Id.* A matter can be deemed actually litigated even if a default judgment has been entered. While under the federal rules of collateral estoppel (as opposed to the Georgia rules of

collateral estoppel), a default judgment is not generally sufficient, "when the parties sought to be precluded actually participated in the prior litigation *and* had a full and fair opportunity to litigate, but the issue was resolved by default as a sanction on account of that party's obstructive behavior", it is appropriate to use collateral estoppel. *Melnor, Inc. v. Corey (In re Corey)*, 394 B.R. 519, 527–28 (10th Cir. BAP 2008), *aff'd*, 583 F.3d 1249 (10th Cir.2009); *see also Insituform Technologies, Inc. v. AMerik Supplies, Inc.*, 850 F.Supp.2d 1336, 1362 (N.D.Ga.2012). The assertion of a party's Fifth Amendment rights does not bar the application of collateral estoppel. *In re Birnbaum*, 513 B.R. at 802.

█ The Debtor argues in his response at Docket No. 103 that the District Court did not consider his evidence. He argues, "The case involving the Securities and Exchange Commission (SEC) was not based on any evidence provided by Defendant Debtor due to the Court's ruling that Defendant Debtor while acting *pro se* missed the discovery date allowing evidence to be entered in the case therefore, the case was virtually ruled on SEC's pleadings [sic]." Defendant's assertion, however, is inconsistent with the District Court Order. The District Court noted Debtor's failure to meet various deadlines but also that he was proceeding *pro se*. The District Court then concluded, "Although Dixon has not fully participated in discovery, the Court will consider his submissions since he is proceeding *pro se*, keeping in mind that the non-moving party must present more than a mere scintilla of evidence in support of his position to avoid summary judgment." *SEC v. Dixon*, 2012 WL 4849890, at *4. Defendant's argument that the issues were not actually litigated is therefore baseless since the court considered his submissions. Even if the court had decided not to consider his submissions as a sanction for failing to fully participate in discovery (in part because he asserted his Fifth Amendment rights to every answer to discovery), the matters decided by the District Court would still have been fully litigated under the decisions described above. Debtor's failure to participate in discovery, whether based on his Fifth Amendment rights or otherwise, was his own decision.

█ The third requirement for the application of collateral estoppel is essentiality. The issue previously determined must have been "necessary to support the final judgment ... [this] requires the court to consider the elements of the prior claim and whether a final judgment was entered." *In re Birnbaum*, 513 B.R. at 802. "This assures that matters that were ancillary to the first determination, and matters that were not finally determined, will not be invoked to bar the consideration of a disputed issue by the second court." *Id.* The Court will review the essentiality of the District Court's findings in conjunction with its analysis of Plaintiffs' Section 523 action.

█ The Debtor argues in his response though that the District Court Order is not final and therefore cannot be used as a basis for collateral estoppel because he appealed it. "[T]he finality requirement for collateral estoppel is 'less stringent' " than the finality requirement of traditional *res judicata*. *Insituform*, 850 F.Supp.2d at 1361 (citation omitted). "A prior decision may be given collateral-estoppel effect so long as it bears 'sufficient indicia of finality' ". *Id.* Under the Restatement (Second) of Judgments, "a final judgment 'includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.' " Restatement (Second) of Judgments, § 13 (1982). One court has held that the following factors,

drawn from the Restatement, are indicia of finality: "The parties were fully heard, the district court supported its decision with a reasoned opinion, and that opinion is the proper subject of appellate review." *Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir.1988); *see also Christo*, 223 F.3d at 1339; *In re Birnbaum*, 513 B.R. at 802. So, even if the District Court Order is on appeal, it is nevertheless final for purposes of collateral estoppel. The issue was fully heard, the court issued a reasoned opinion, and the matter was subject to appeal. Furthermore, the Court takes judicial notice that Debtor's appeal of the District Court Order was dismissed on August 15, 2014 by the Sixth Circuit. Judicial notice is appropriately taken by the Court under Fed. R. Evid. 201(b) which permits the Court to take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Under this Rule, the Court may take judicial notice on its own and at any stage of the proceeding. Fed. R. Evid. 201(b)(2), (c)(1) and (d). The Court finds that the District Court Order is final for purposes of collateral estoppel.

■ The last element to establish the right to use collateral estoppel is that the other party had a full and fair opportunity to litigate the matter. This requirement asks the court to consider "whether that party 'was fully able to raise the same factual or legal issues in the prior litigation.'" *In re Birnbaum*, 513 B.R. at 802 (citation omitted). The Court notes the Debtor had every motivation to litigate fully against the SEC in the District Court Action. The District Court Action resulted in an order of disgorgement of over $3 million plus civil penalties. Moreover, the standard of proof is the same in both a bankruptcy court dischargeability action (preponderance of the evidence) as it is in

a district court action dealing with the Securities Anti–Fraud Provisions. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 387, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). As such, the Court finds Debtor had a full and fair opportunity to litigate.

So the sources of the Court's findings of fact are the Debtor's admissions in response to the pleadings in the case, the Debtor's deemed admissions due to his failure to respond to the requests for admission filed by the Plaintiffs, and matters which are binding on the Debtor by virtue of collateral estoppel as decided by the District Court Order.

## DISCHARGEABILITY OF CLAIM OF PGERS AS TO LETTER UNDER SECTION 523(a)(2)(A) (FALSE REPRESENTATION)

■ Based on the foregoing, the following facts related to PGERS' claim for fraud related to the Letter are undisputed.[1] Debtor was involved in the formation of OCA on September 7, 2006 as a Delaware limited liability company. Debtor was the managing member of OCA from December 31, 2006 through August 17, 2009. In the summer of 2006, Debtor began soliciting the Plaintiffs to invest in a Limited Partnership Fund (as defined below) which OCA planned to establish. OCA would be the general partner in the Limited Partnership Fund and the investors, including Plaintiffs, would be limited partners. In September 2006, PGERS was provided a draft private placement memorandum ("PPM"). A final PPM was later provided to PGERS.

On November 29, 2006, the Debtor attended a meeting of PGERS where he described the proposed limited partnership, and OCA and its principals, and dis-

---

1. Other undisputed facts will be set out in the context of the claim to which they relate.

cussed the proposed investment. At the conclusion of the meeting, PGERS tabled the issue of investment with OCA because it had additional questions, particularly as to Debtor's experience. In the PPM, and in the Debtor's presentation to PGERS, he represented that Elliot K. Fullen ("Fullen") would be the strategic partner in OCA and as such would be involved in OCA's investment decisions on behalf of the Limited Partnership Fund. In the materials provided by the Debtor to PGERS at the November 29, 2006 meeting, Fullen was described as follows:

> In his 20–plus year business career prior to joining the General Partner [OCA] and the Fund, Mr. Fullen has held several general management and senior financial positions with global responsibility at Fortune 500 companies. Spending most of his corporate career with Duracell, Inc. and Hexion Specialty Chemical Inc. formerly Borden Inc., he has. worked closed with Kohlberg, Kravis & Roberts (KKR) and Apollo Management L.P. to grow businesses across the world.

In November 2006 and January 2007, the trustees for PGERS stated it was important that Fullen join OCA so that OCA would have someone on board with sufficient experience, given Debtor's lack of experience in this type of investment. The minutes of the PGERS board meeting are replete with inquiries regarding Fullen and his role in the company. (*See e.g.,* Brief Ex. 8 and attached thereto, Ex. C, at 10, 12, 13; Ex. D, at 11; Ex. E, at 10). On February 21, 2007, after additional information was provided by OCA, PGERS voted to invest up to $5 million in the Limited Partnership Fund. PGERS initially refused OCA's capital calls, however, and indicated it would not go forward without a written assurance that Fullen was a principal of OCA.

On November 5, 2007, OCA sent a letter to PGERS, attention Ellen Zimmermann ("Letter"), stating as follows:

> Dear Ms. Zimmerman [sic], This is to advise you that 100% ownership of Onyx Capital Advisors, LLC is held by Roy Dixon, Jr., Elliot K. Fullen and LaRoy A. Williams. In addition, 100% of Mr. Dixon, Mr. Fullen and Mr. Williams' efforts are with the firm. All of whom actively participate in the operations, due diligence and negotiations of and on behalf of Onyx Capital Advisors, LLC. Should you need any additional information, please feel free to call 313–965–0186.

At the bottom of the letter are three signature blocks with what appear to be three different signatures, one for Roy Dixon Jr., one for "Elliot" K. Fullen (whose name was signed as "Elliott"), and one for La-Roy A. Williams. In reliance on the Letter, the PPM and other Debtor representations, PGERS made its first investment on June 4, 2008. Between then and February 2, 2009, PGERS invested $3,643,200.[2]

It turned out, however, that Fullen did not sign the Letter. Fullen testified he did not sign the Letter, did not authorize his signature, and that the information contained in the Letter was a "falsehood". The Debtor directed the preparation of the

---

2. Plaintiffs' Statement of Material Facts states that PGERS invested "$3,643,700 in the Limited Partnership in response to capital calls" between June 4, 2008 and February 2, 2009. The Statement of Material Facts relies on DPFRS' Admissions, No. 10, which lists $3,643,200 as the amount invested during that time frame. Plaintiffs' Motion and related Brief also list the contribution amount at $3,643,200. (Motion at 2; Brief at 34, 39). Thus, the Court finds the correct amount is $3,643,200; the $3,643,700 appears to be typographical error.

Letter. The Debtor testified his assistant signed the Letter at the Debtor's direction. The Debtor has admitted that the Letter was false and that Fullen was never a member or employee of OCA and never received any compensation from OCA. In fact, when the Letter was signed, Fullen was employed full time by another company, did not live in Michigan, and was not involved in negotiating the terms of any potential investment on behalf of OCA. When PGERS learned in June 2009 that Fullen was never employed by OCA and that he did not sign the Letter, PGERS notified the Debtor and OCA "it would no longer fund any capital calls and was freezing its investment at the current level." *SEC v. Dixon,* 2012 WL 4849890, at *5. PGERS' investment of at least $3,643,200 was not returned to it.

■ Exceptions to discharge are to be strictly construed, and the burden is on the creditor to prove the exception by a preponderance of evidence. *Grogan,* 498 U.S. 279, 111 S.Ct. 654; *St. Laurent v. Ambrose (In re St. Laurent),* 991 F.2d 672, 677 (11th Cir.1993).

■ Under Section 523(a)(2)(A) of the Bankruptcy Code, a debt is non-dischargeable if it is "for money, property, services or an extension, renewal or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." In order to succeed under this provision, a creditor has the burden of proving the following:

(1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was justifiable, and (7) that

damage proximately resulted from the misrepresentation.

*Rubin v. West (In re Rubin),* 875 F.2d 755, 759 (9th Cir.1989) (citation omitted). A representation is material if it "would be important to the reasonable man or would be important to plaintiff for a particular reason known to the debtor." *Lance v. Tillman (In re Tillman),* 197 B.R. 165, 169 (Bankr.D.D.C.1996). Intention to deceive the creditor must exist at the time of the misrepresentation, and be actual, not implied, though gross recklessness may be sufficient. *See Holmes v. Nat'l City Bank (In re Holmes),* 414 B.R. 115, 130 (E.D.Mich.2009). Courts should look to the totality of the circumstances to determine intent. The justifiable reliance standard is an individual standard that requires examination of the surrounding circumstances and the qualities of the particular plaintiff. *Field v. Mans,* 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

PGERS alleges it has a claim against the Debtor for fraud and misrepresentation arising from the Letter. The claim must arise independent of bankruptcy law, as Section 523 only addresses whether a claim is non-dischargeable, not whether it exists at all. While neither party cites to the particular law under which PGERS' claim related to the Letter arises, the Court concludes any claim of fraud arises under Michigan law since the representations occurred in Michigan and to PGERS, a Michigan entity. The elements of fraud under Michigan law are "almost completely identical" to the elements of 11 U.S.C. § 523(a)(2)(A). *Transnation Title Ins. Co. v. Livingston (In re Livingston),* 389 B.R. 1, 5 (E.D.Mich.2008). To make a claim for fraud under Michigan law, the plaintiff must show:

(1) that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or

she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury.

*Id.* (citation omitted); *Tocco v. Richman Greer Prof'l Ass'n,* 912 F.Supp.2d 494, 516 (E.D.Mich.2012) (citation omitted). Given the identity of the elements of Section 523(a)(2)(A) and fraud under Michigan law, the Court will analyze the elements of Section 523(a)(2)(A) and the Michigan law of fraud together.

First, it is undisputed that the Debtor made a representation to PGERS through the Letter. The Letter states that "100% ownership of Onyx Capital Advisors LLC is held by Roy Dixon Jr., Elliot K. Fullen and LaRoy A. Williams. In addition, 100% of Mr. Dixon, Mr. Fullen and Mr. Williams' efforts are with the firm." Even though the Letter is on the letterhead of OCA, it is signed personally by the Debtor and not in any representative capacity. Moreover, it is undisputed that the Debtor had his assistant sign Fullen's name to the Letter, so the action complained of (forgery of Fullen's name) was the Debtor's action directly and not the action of the corporation.

While ordinarily being an officer or agent or manager of a corporation does not render one personally liable for a tort committed by the corporation, directors, officers and managers can be individually liable to third parties for participating in or assenting to torts committed by them or their corporation. This liability arises from the tortious conduct of the individual and does not rely on piercing the corporate veil. *See Ford Motor Credit Co. v. Owens,* 807 F.2d 1556, 1559 (11th Cir.1987); *Capitol Indem. Corp. v. Interstate Agency, Inc.*

*(In re Interstate Agency, Inc.),* 760 F.2d 121, 125 (6th Cir.1985); *Murray v. Woodman (In re Woodman),* 451 B.R. 31, 44 (Bankr.D.Idaho 2011); *Livonia Bldg. Materials Co. v. Harrison Const. Co.,* 276 Mich.App. 514, 742 N.W.2d 140, 143 (2007). Further, statements made by a corporation or partnership of which a debtor is an insider, such as a managing member, may be attributed to the debtor. *See Sherwin Williams Co. v. Grasso (In re Grasso),* 497 B.R. 434, 443 (Bankr.E.D.Pa.2013). The undisputed facts here are that the Debtor was the managing member of OCA; he prepared the Letter; he signed it not in a representative capacity; and he directed his assistant to sign on behalf of Fullen. (DPFRS' Admissions No. 3; PGERS' Admissions Nos. 3, 4, 6). The actions of which PGERS complains are therefore the Debtor's individual actions and not the actions of OCA.

Second, the representations in the Letter were false, and the Debtor knew they were false. The Debtor argues the representations were not false because Fullen was involved with OCA. The Letter, though, does not state that Fullen is "involved", but that he is an owner and that 100% of his efforts are with OCA. It is undisputed that this statement was untrue. The District Court in its Order concluded that the Debtor made misrepresentations to PGERS. The District Court found "there is no genuine issue of material fact that Fullen's signature was forged and not authorized by Fullen." *SEC v. Dixon,* 2012 WL 4849890, at *7. The District Court also found that "Dixon had knowledge that Fullen had not signed the letter provided to the Pontiac GERS." *Id.* The District Court rejected the Debtor's claims that Fullen gave him permission to sign his name to the Letter. The District Court also rejected the Debtor's argument that the Letter was "merely an 'intention'

that he and Fullen would share the company's ownership and devote 100% of their efforts to the company 'in the future'." *Id.* As the District Court pointed out, the Letter is not a forward-looking statement but a statement of the present status of Fullen's ownership and commitment to OCA. *Id.* The District Court's conclusion and findings in this respect are entitled to collateral estoppel effect. The issue as to whether a misrepresentation of a material fact occurred is an element of each of the Securities Anti–Fraud Provisions, which the District Court analyzed, common-law fraud under Michigan law and 11 U.S.C. § 523(a)(2)(A). So the District Court's finding on this element is final.

In further support of the Court's conclusion that the Debtor made false representations to PGERS related to the Letter and that the Debtor knew the representations were false, the Debtor has admitted in response to PGERS' Admissions No. 7 that all the statements in the Letter were false and he knew they were false when they were made. The Debtor has also admitted that Fullen was never a member or employee of and never received any compensation from OCA and that at the time the Letter was signed, Fullen was employed fulltime by another company. (PGERS' Admissions Nos. 8 and 9). The Debtor has also admitted that, at the time the Letter was signed, Fullen did not live in Michigan and was not involved in negotiating the terms of any potential investment on behalf of OCA. (PGERS' Admissions Nos. 10 and 11). Finally, Fullen's testimony attached as Exhibit 13 to the Brief and also on which the District Court relied makes clear that the Letter is "a complete misrepresentation ... and an absolute falsehood." (Brief Ex. 13, Fullen Dep. 150:4–21). Fullen testified further he did not authorize the Debtor or anyone else to sign his name to the Letter and he was not informed of the Letter. (Brief Ex. 13, Fullen Dep. 153:5–12). The statements made in the Letter were false at the time they were made, and the Debtor knew they were false.

Third, the statements made in the Letter were material. "A misrepresentation [for purposes of Section 523] is material if it would be important to the reasonable man or would be important to the plaintiff for a particular reason known to the Debtor." *In re Tillman,* 197 B.R. at 169 (citation omitted). The law of Michigan is virtually identical. *In re Livingston,* 389 B.R. at 5. The definition of materiality with respect to the Securities Anti–Fraud Provisions is substantially the same. The District Court stated, "A fact is 'material' when a substantial likelihood exists that a reasonable shareholder would consider the fact important in making his investment decision and a reasonable shareholder would view the information as having significantly altered the total mix of information." *SEC v. Dixon,* 2012 WL 4849890, at *4. The District Court concluded that the statements in the Letter were material "given that the Pontiac GERS required written confirmation that Fullen was a principal of Onyx Capital before agreeing to invest with Onyx Capital." *Id.* at *7. The District Court's conclusion on materiality was essential for its determination that the securities laws had been breached. The District Court's conclusion as to materiality is therefore binding on this Court under the doctrine of collateral estoppel.

Fourth, under Michigan law and Section 523(a)(2)(A), the misrepresentation must have been made with intent. Under Section 523(a)(2)(A) the intent must be to deceive and under Michigan law, the intent must be that it should be acted upon by the other party. Under the Securities Anti–Fraud Provisions, the party making the representation must have acted with *scienter.* For purposes of non-discharge-

ability, the intention of deceiving the creditor must exist at the time of the misrepresentation and be actual, not implied, though gross recklessness is sufficient. *See In re Holmes,* 414 B.R. at 130. "Reckless disregard to the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent [to deceive]." *Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 305 (11th Cir.1994) (alteration in original) (citation omitted). Similarly, "[s]cienter may be established by proof of recklessness— 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *SEC v. Dixon,* 2012 WL 4849890, at *4. The Supreme Court compared *scienter* in the securities law to "intent to deceive" in the bankruptcy context in *Bullock v. BankChampaign, N.A.,* —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013). There the Court noted the requisite showing of intent to prove defalcation under 11 U.S.C. § 523(a)(4) is commensurate with the *scienter* required to establish a violation of the securities laws. *Scienter* under the securities laws is a mental state of mind embracing intent to deceive, manipulate or defraud. The court noted further that a fiduciary's "reckless conduct" may be equivalent to knowingly improper and therefore may constitute a defalcation, "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* at 1759; *e.g., Parker v. Grant (In re Grant),* 237 B.R. 97, 115 (Bankr.E.D.Va.1999). Given the similarities between the discussion in *Bullock* and cases related to Section 523(a)(2)(A), the recklessness standard used by the District Court would also satisfy the intent to deceive requirement of Section 523(a)(2)(A). Intent to deceive necessarily incorporates an intent to have the party act on the representation.

The District Court concluded the Debtor acted with *scienter* in presenting the Letter to PGERS. The District Court relied upon the Debtor's control of OCA and his knowledge that Fullen had not signed the Letter provided to PGERS. The District Court's conclusion of *scienter* is entitled to collateral estoppel effect in this case given that extreme recklessness satisfies the element of intent under both Section 523(a)(2)(A) and the Securities Anti–Fraud Provisions and that the District Court's finding of *scienter* was essential to the determination there was a violation of the securities laws.

Moreover, the Court concludes the undisputed facts show the Debtor's intent to deceive PGERS and have PGERS act upon the Letter. The Debtor forged, or asked his assistant to forge, Fullen's signature. Fullen's signature is even misspelled on the Letter. As the District Court found, the Letter was requested and required by PGERS as a condition of funding the capital calls which the Debtor was making. The minutes of the PGERS board meetings are replete with inquiries regarding Fullen, his participation and role in the company, because the Debtor was inexperienced in this area. There is no explanation for the delivery of the Letter to PGERS other than to have PGERS rely upon the Letter to satisfy its concerns that Fullen was not an owner in the company and was not devoting 100% of his time to the company. Consequently, the Court concludes the Debtor signed the Letter and had Fullen's name signed to the Letter for the sole purpose of deceiving PGERS and inducing it to deliver money to OCA and the Limited Partnership Fund.

The next element under Michigan law and Section 523(a)(2)(A) is that there be a finding of causation, i.e., reliance on the misrepresentations caused the Plaintiffs'

damages. *ColeMichael Invs., L.L.C. v. Burke (In re Burke)*, 405 B.R. 626, 647 (Bankr.N.D.Ill.2009) (alternation in original) (citation omitted) *aff'd*, 436 B.R. 53 (N.D.Ill.2010); *In re Livingston*, 389 B.R. at 5. Reliance is the extent to which the creditor actually changed its position based on the misrepresentation. Reliance must be reasonable under Michigan law. *Tocco*, 912 F.Supp.2d at 516. The reliance must only be justifiable under Section 523(a)(2)(A), which is a more lenient standard that does not bring with it a duty to investigate. *See Field*, 516 U.S. at 77, 116 S.Ct. 437. The justifiable reliance standard is an individual standard that requires examination of the surrounding circumstances and the qualities of the particular plaintiff. *Id.* at 76, 116 S.Ct. 437.

While reliance by PGERS was not an element in the District Court Action, the District Court analyzed PGERS' reliance in reaching its conclusion that the Debtor violated the securities laws. The District Court found that PGERS required written confirmation that Fullen was a principal of OCA before agreeing to invest with OCA. The District Court made this finding as part of its conclusion that the representation of Fullen's involvement was material and made in connection with the sale or purchase of securities. This finding was necessary for the District Court to reach its conclusion. The evidence shows that PGERS investigated the Debtor and OCA by asking questions of the Debtor multiple times regarding Fullen's involvement in the company, in its investment decisions, and in advising the Debtor. Additionally, undisputed facts in this case show that PGERS did not provide funds to the Debtor or the Limited Partnership Fund until receipt of the Letter. (*See* Brief Ex. 8, Zimmermann Aff. ¶ 10). When PGERS learned of the misrepresentation, it froze its investment. *SEC v. Dixon*, 2012 WL 4849890, at *5. The Court concludes that PGERS relied on the Letter in advancing funds for investment to the Debtor and that the reliance was reasonable and justified.

Having found the Debtor made a representation to PGERS that was false and material, that the Debtor knew at the time it was false, that the Debtor made it with the intention of PGERS relying on it and with the intention to deceive PGERS, and that PGERS reasonably and justifiably relied on the representation, the only remaining issue is the damages suffered by PGERS as a result of its reliance on the Letter. The undisputed fact is that PGERS invested $3,643,200 between June 4, 2008 and February 2, 2009 in the Limited Partnership Fund the Debtor managed. This is the amount which PGERS requests in the Motion. The Debtor's only response is that he did not know exactly how much had been advanced. The Debtor's obligation, in responding to a motion for summary judgment, is to identify specific facts in the record that dispute the facts asserted by the plaintiff. Since the Debtor has not pointed to anything to dispute that $3,643,200 was invested by PGERS in the Limited Partnership Fund, the Court concludes PGERS is entitled to damages in at least the amount of $3,643,200.

PGERS has shown based on the undisputed material facts that the Debtor is liable to PGERS for fraud under Michigan common law and that the claim is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

### DISCHARGEABILITY OF ALL PLAINTIFFS' CLAIMS UNDER SECTION 523(a)(4)

All Plaintiffs allege the Debtor owes

them \$16,010,958 [3] collectively, representing a part of their investment in the Limited Partnership Fund. This amount is the alleged damages resulting from the Debtor's and OCA's breach of their fiduciary duties of loyalty and care to Plaintiffs. The additional undisputed facts related to this claim are as follows:

Debtor was a member of OCA. From December 31, 2006 through 2010, Debtor was the majority member of OCA, owning between 85% and 90% of the membership interests. During that time, he alone controlled OCA. He was the managing member from December 31, 2006 to August 17, 2009. As of June 7, 2007, OCA and each of the Plaintiffs executed an Agreement of Limited Partnership of Onyx Capital Advisory Fund I, LP (the "Limited Partnership Agreement"). OCA signed as general partner and Plaintiffs as limited partners. Plaintiffs were and remained the only limited partners of Onyx Capital Advisory Fund I, LP (the "Limited Partnership Fund"). Between July 26, 2007 and December 19, 2008, Detroit PFRS invested \$9,750,000 and Detroit GRS invested \$9,804,251 in the Limited Partnership Fund by transferring those amounts in response to capital calls. Between June 4, 2008 and February 2, 2009, PGERS invested \$3,643,200.

 Plaintiffs argue their claim for breach of fiduciary duty is non-dischargeable under 11 U.S.C. § 523(a)(4) because the Debtor committed fraud or defalcation while acting in a fiduciary capacity. A fiduciary relationship under Section 523(a)(4) is to be construed narrowly. *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir.1993) (citation omitted). "Section 523(a)(4) requires that the debtor, acting as a fiduciary in accordance with an express or technical trust that existed prior to the wrongful act, committed an act of fraud or defalcation." *Estate of Newton v. Lemmons (In re Lemmons)*, 2005 WL 6487216, at *4 (Bankr.N.D.Ga. Dec. 20, 2005) (citation omitted). A technical trust has been defined by the Eleventh Circuit as "an express trust created by statute or contract that imposes trust-like duties on the defendant and that pre-exists the alleged defalcation," as opposed to constructive or resulting trusts. *Parker v. Ferland (In re Ferland)*, 2010 WL 2600588, at *3 (Bankr.M.D.Ga. June 21, 2010) (citation omitted); *see also Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir.2006). "Mere friendship does not meet this standard, nor does an ordinary business relationship." *In re Ferland*, 2010 WL 2600588, at *3 (citation omitted). Thus, a plaintiff must show that (i) the debtor held a fiduciary position *vis a vis* the plaintiff under a technical, express or statutory trust; (ii) that the claim arose *while* the debtor was acting as a fiduciary; and (iii) that the claim is for fraud or defalcation. The fiduciary capacity alleged by Plaintiffs is that the Debtor was the managing member of OCA which was the general partner of the Limited Partnership Fund, of which Plaintiffs were the limited partners. Assuming, without deciding, that Plaintiffs have a claim for breach of fiduciary duty, fraud or defalcation, the question is whether the Debtor is a fiduciary as that term is used in Section 523(a)(4).

 While the meaning of the word "fiduciary" in Section 523 "is a question of federal law," *Smith v. Khalif (In re Khalif)*, 308 B.R. 614, 621–22 (Bankr.N.D.Ga. 2004), state law can be consulted in ascertaining whether such a duty has been imposed. *See Quaif*, 4 F.3d at 954. Here, the Limited Partnership Fund is a Delaware limited partnership. Under the De-

---

**3.** This is the amount Plaintiffs claim was invested in SCM entities.

laware Uniform Limited Partnership Act, "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law ...". 6 Del. C. § 17–403(b)–(c). Under the Delaware Revised Uniform Partnership Act, a partner only has the fiduciary duties of loyalty and care to the partnership and other partners. 6 Del. C. § 15–404(a). These are defined further as follows:

(b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:

(1) to account to the partnership and hold as trustee for it any property, profit or benefit derived by the partner in the conduct or winding up of the partnership business or affairs or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

(2) to refrain from dealing with the partnership in the conduct or winding up of the partnership business or affairs as or on behalf of a party having an interest adverse to the partnership; and

(3) to refrain from competing with the partnership in the conduct of the partnership business or affairs before the dissolution of the partnership.

(c) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business or affairs is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of the law.

6 Del. C. § 15–404(b)–(c). Courts analyzing similar provisions in partnership or limited partnership acts have concluded that the provisions impose the type of technical trust that is required under 11 U.S.C. § 523(a)(4). In particular, the courts focus on the language in Section 15–404(b)(1) that the partner is to "hold as trustee for it any property, profit or benefit derived". *See Blixseth v. Blixseth (In re Blixseth)*, 459 B.R. 444, 459–60 (Bankr. D.Mont.2011). Some states' laws are different though, providing the partner holds as trustee any property, profits or benefits derived by it "without the consent of the partners". In those states, courts have construed the trust to be one *ex maleficio*, or a resulting trust. A resulting trust is not the type of technical trust required for Section 523(a)(4).[4] *See Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986); *Errez v. Auburn Ace Holdings, LLC (In re Errez)*, 2010 WL 5185399, at *2 (W.D.Wash. Dec. 16, 2010); *In re Woodman*, 451 B.R. at 38. Here the Delaware limited partnership statute imposes a technical trust on a partner which is sufficient to support a claim under Section 523(a)(4).

■ Under this analysis OCA, as the general partner of the Limited Partnership Fund, held a fiduciary duty to Plaintiffs. But Plaintiffs allege the Debtor personally was in a fiduciary position, even though he was not personally a partner in the Limited Partnership Fund. Delaware cases recognize that "a director, member, or officer of a corporate entity serving as the general partner of a limited partnership ... who exercises control over the partnership's property owes fiduciary duties directly to the partnership and its limited partners." *Paige Capital Mgmt.*,

---

**4.** The Georgia version of the Uniform Limited Partnership Act also includes the phrase "without the consent of the other partners" and has been construed as not creating an express or technical trust sufficient to support non-dischargeability under Section 523(a)(4). *See Blashke v. Standard (In re Standard)*, 123 B.R. 444, 453–54 (Bankr.N.D.Ga.1991).

LLC v. Lerner Master Fund, LLC, 2011 WL 3505355, at \*30 (Del.Ch. Aug. 8, 2011); see also LSP Inv. P'ship v. Bennett (In re Bennett), 989 F.2d 779, 785–86 (5th Cir. 1993) (applying Texas law); Mullen v. Jones (In re Jones), 445 B.R. 677, 711 (Bankr.N.D.Tex.2011) (applying Texas law). Such control may exist by the legal opportunity to control, such as being the majority shareholder, or by actual control because the shareholder "exercises actual control and direction over corporate management." Guerriero v. Kilroy (In re Kilroy), 354 B.R. 476, 493 (Bankr.S.D.Tex. 2006) (citations omitted) aff'd, 2007 WL 1456006 (S.D.Tex. May 15, 2007) (ailing on motion to dismiss). Further:

> When a limited partnership acts as the managing partner of another limited partnership, the individual controlling the first partnership … owes a duty to both. The same rule applies to the president of a limited liability company that acts as the managing partner of a limited partnership. Finally, the sole shareholder and director of a corporate managing partner owes fiduciary duties to the limited partnership when he controls corporate actions.

Harwood v. FNFS, Ltd. (In re Harwood), 427 B.R. 392, 396–97 (E.D.Tex.2010) (citations omitted), aff'd, 637 F.3d 615 (5th Cir.2011). The district court in Harwood reiterated that "the issue of control has always been the critical fact looked to by the courts in imposing this high level of responsibility." Id. at 397 (citations omitted); see also In re Bennett 989 F.2d at 789. In the Fifth Circuit Harwood opinion, the court, construing Texas law, concluded that:

> an officer of a corporate general partner who is entrusted with the management of the limited partnership and who exercises control over the limited partnership … owes a fiduciary duty to the

partnership that satisfies Section 523(a)(4). We emphasize that it is not only the control that the officer actually exerts over the partnership, but also the confidence and trust placed in the hands of the controlling officer, that leads us to find that a fiduciary relationship exists sufficient for the purposes of Section 523(a)(4).

637 F.3d at 622.

■ It is undisputed that, during the operative time frame, the Debtor was the managing member of OCA, the general partner of the Limited Partnership Fund. The Debtor is deemed to have further admitted that he was the majority member of OCA from December 31, 2006 through 2010, owning between 85% and 90% of the membership interests, and that he alone controlled OCA during this time frame. Finally, the District Court Order states, "[t]here is no genuine issue of material fact that Dixon has controlled Onyx Capital since its inception." SEC v. Dixon, 2012 WL 4849890, at \*7. The District Court made this finding in determining whether the scienter requirement of the securities laws had been met. Plaintiffs may rely upon this finding under the principle of collateral estoppel because it was actually litigated, material and necessary to the District Court's conclusion that the individual Debtor had the requisite scienter. Thus, under Delaware law, the Debtor personally held a fiduciary position vis a vis the limited partners in the Limited Partnership Fund sufficient to satisfy Section 523(a)(4).

■ Nevertheless, this general statutory fiduciary duty is qualified by Delaware law permitting the parties to agree to a lesser or more expansive standard of obligations. Delaware statutory law allows the parties to a partnership agreement to expand, restrict or eliminate the duties of a partner "provided that the part-

nership agreement may not eliminate the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 17–1101(d). This is in recognition of the state's policy "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." 6 Del. C. § 17–1101(c); *see also Gotham Partners, L.P. v. Hallwood Realty Partners, LP.,* 2000 WL 1476663 (Del.Ch. Sept. 27, 2000). "[W]here the partnership agreement provides a standard that will govern the duty owed by a general partner to its partners in self-dealing transactions it is the contractual standard and not the default fiduciary duty of loyalty's fairness standard that exclusively controls." *Gotham Partners,* 2000 WL 1476663, at *10. Contractual obligations, however, do not rise to the level of technical trusts for purposes of Section 523(a)(4). As one court recognized, the arguments place the court

> in the position of making a less-than-scientific judgment about the interplay between the contractual and fiduciary duties of general partners of limited partnerships. Determinations of whether the provisions of a limited partnership agreement are inconsistent with the application of default fiduciary duties are necessarily imprecise and often require close judgment calls. While demanding that the parties to a limited partnership agreement make their intentions to displace fiduciary duties "plain," the cases have erred on the side of flexibility regarding the type of evidence sufficient to support a judicial finding that such an intention existed.... [O]ur courts have thus far adhered as a general matter to a close examination of whether the application of default fiduciary duties can be reconciled with the practical and efficient operation of the terms of the limited partnership agreement. Where such a reconciliation is possible, the court will

apply default fiduciary duties in the absence of clear contractual language disclaiming their applicability. But where the use of default fiduciary duties would intrude upon the contractual rights or expectations of the general partner or be insensible in view of the contractual mechanisms governing the transaction under consideration, the court will eschew fiduciary concepts and focus on a purely contractual analysis of the dispute. Put somewhat differently, the irreconcilability of fiduciary duty principles with the operation of the partnership agreement can itself be evidence of the clear intention of the parties to preempt fiduciary principles.

*R.S.M. Inc. v. Alliance Capital Mgmt. Holdings L.P.,* 790 A.2d 478, 497–98 (Del. Ch.2001) (citations omitted); *see also Gotham Partners,* 2000 WL 1476663, at *10 ("[T]he defendants have convinced me that the Partnership Agreement leaves no room for the application of common law fiduciary principles to measure the General Partner's conduct.... The provisions of the Agreement that articulate these duties fully encompass Gotham's claims"). If the Limited Partnership Agreement limits the corporate general partner's duties to good faith, rather than as a fiduciary, a higher standard may not be imposed on the controlling member. *See Guerriero v. Kilroy (In re Kilroy),* 2008 WL 780692, at *6 (Bankr.S.D.Tex. Mar. 24, 2008) (ruling on motion for summary judgment).

Here, the parties have submitted two different versions of the Limited Partnership Agreement, and it is the applicable provision 6.9 that is different in each. Plaintiffs attach to their Exhibit 7 a copy of the Limited Partnership Agreement with Detroit GRS. Section 6.9 of that partnership agreement provides as follows:

> None of the General Partner or any member, manager, shareholder, di-

rector, officer, employee, agent, advisor, representative or affiliate of the General Partner (or any of their respective members, managers, shareholders, partners, directors, officers, employees ...) shall be liable to any Limited Partner or the Partnership for (a) any action taken, or failure to act, as General Partner, or on behalf of the General Partner, with respect to the Partnership ... unless and only to the extent that such action taken or failure to act is a willful violation of the material provisions of this Agreement or constitutes gross negligence or willful malfeasance by such Person or was taken or failed to be taken in bad faith, (b) any action or inaction arising from reliance in good faith upon the opinion or advice as to legal matters of legal counsel or as to accounting matters of accountants selected by any of them with reasonable care or (c) the action or inaction of any agent, contractor or consultant selected by any of them with reasonable care, in each case to the extent permitted by the Partnership Act.

The Limited Partnership Agreement submitted by the Detroit PFRS contains the same language. (Brief Ex. 6 and Ex. D attached thereto). Interestingly, neither of the copies submitted by Detroit PFRS or Detroit GRS contains the signature of PGERS and Plaintiffs have not submitted any partnership agreement signed by PGERS. On the other hand, the Debtor has submitted a copy of the Limited Partnership Agreement that is unsigned but which he alleges is THE copy of the partnership agreement. (Def.'s Resp. Ex. 3). This copy of the partnership agreement contains slightly different language in Section 6.9. It provides in subsection (a) that the general partner is liable for acts which constitute "negligence" in addition to acts which are a willful violation, actions taken in bad faith and acts constituting willful malfeasance.

When determining whether the parties have reduced or eliminated fiduciary duties with contractual provisions, the Court must examine the question in the context of the specific act challenged. Only then can the Court determine if the act complained of violated a provision of the partnership agreement, which would give rise only to a contract claim and not a fiduciary duty claim, or whether the matter was not addressed by the contract and therefore fell into the general default provisions of fiduciary duty. The Limited Partnership Agreement submitted by the Plaintiffs is very similar to that reviewed in *In re Kilroy* in connection with the motion for summary judgment, which provided: "The General Partner, however, is liable for errors or omissions in performing its duties with respect to the Partnership only in the case of bad faith, gross negligence, or breach of the provisions of this Agreement, but not otherwise." 2008 WL 780692, at * 6. When the bankruptcy court was presented a copy of the partnership agreement, the court concluded the partnership provision was sufficient to replace general fiduciary duties. *Id.*

 The Court concludes that a grant of summary judgment is not appropriate with respect to the question of whether the Debtor held a fiduciary position for·purposes of Section 523(a)(4). First, there is a dispute as to the terms of the Limited Partnership Agreement to be considered since each party has submitted a different version. Moreover, the Court will be better able to decide whether the Debtor was acting in a fiduciary capacity by hearing evidence as to the specific allegedly wrongful acts of the Debtor, so the Court can ascertain whether those acts violate contractual provisions of the partnership agreement or fall to the default statutory fiduciary provisions. Thus, summary judgment is denied on this Count.

### DISCHARGEABILITY OF ALL PLAINTIFFS' CLAIMS UNDER SECTION 523(a)(2)(A) (FALSE REPRESENTATION)

■ Plaintiffs allege they are entitled to summary judgment because their claims arise from the Debtor's false representations and such claims are non-dischargeable under Section 523(a)(2)(A). Of course, Plaintiffs must first show they have a claim before the Court addresses the dischargeability of the claim. Since Plaintiffs allege a claim based on fraud, and the elements of fraud under Michigan law are virtually identical to the elements of false representation under Section 523(a)(2)(A), the Court will review both simultaneously.

In addition to the undisputed facts discussed in the prior sections, the Court finds the following facts are undisputed. In the PPM and Debtor's presentation to all of the Plaintiffs regarding the opportunity to invest in the Limited Partnership Fund, he stated the Limited Partnership Fund would invest in companies that are mid-market, located in the Midwest and/or are primarily involved in manufacturing. He also described the investments as being equity or mezzanine investments. For example, in the PowerPoint presentation provided to all three of the Plaintiffs, under the title "Investment Strategy and Philosophy", it states:

> The Fund is primarily focused on meeting the ongoing demand for equity and mezzanine financing from middle-market and/or Midwest-based companies which generally require less than $10 million in new capital.... The Fund will seek to achieve this objective by acquiring equity and mezzanine securities with a preferred or minimum return and/or balance sheet priority over traditional common equity.

(Brief, Exs. 6 and 7 and Ex. B thereto). The PowerPoint further describes that the investment "will typically take the form of preferred stock, subordinated debt with warrants, or common stock ...". As to geographic preference, the PowerPoint states that the "Fund intends to invest primarily in companies located in the Midwest and/or in the middle-market sector. The Fund will, however, consider investments in selected segments selectively throughout the world." (*Id.*) Similarly, the final version of the PPM states, "The Fund is primarily focused on meeting the ongoing demand for equity and mezzanine financing from middle-market and/or Midwest-based companies ...". It further states:

> Equity investments will generally take the form of common or preferred equity (or their equivalent) with preferred return characteristics and/or scheduled liquidity features ... Preferred stock and subordinated debt investments will be accompanied by warrants, conversion rights, common stock or other equity-like rights, providing the Fund with a combination of current income and equity appreciation.

(Brief Ex. 21).

The PPM, the PowerPoint and other disclosures made by the Debtor also contained representations regarding Fullen's involvement in OCA. Fullen is presented as the "strategic partner" in the PPM. The PowerPoint describes Fullen as being responsible "for originating and structuring portfolio investments, coordinating due diligence, negotiating transaction terms, working with Portfolio Company management teams, and managing the disposition of General Partner and Fund investments." (Brief, Exs. 6 and 7 and Ex. B thereto).

Finally, according to the deemed admissions, the Debtor represented to Detroit GRS and Detroit PFRS that OCA maintained one or more insurance policies for

errors or omissions of its employees and/or fidelity bonds covering dishonesty, malfeasance or other wrongdoing of its employees including the Debtor.[5] Nevertheless, this representation was untrue.

After these representations were made, the Plaintiffs signed the Limited Partnership Agreement as of June 7, 2007, as the limited partners of the Limited Partnership Fund. Notwithstanding the representations to the Plaintiffs that the primary focus of the Limited Partnership Fund investments was middle-market companies, preferably in the Midwest and preferably in manufacturing, the Debtor informed Michael Farr ("Farr") that his companies would be the first to receive money from the Limited Partnership Fund, as long as they passed the partnership's due diligence. Almost immediately, the Debtor, on behalf of the Limited Partnership Fund, made a capital call on the limited partners, as a result of which Detroit GRS and Detroit PFRS each invested $1.4 million in July 2007. PGERS did not respond to the capital call as discussed above. The funds invested in response to this capital call provided a loan to Second Chance Motors, Inc. ("SCM") in the amount of $2 million. SCM was incorporated by Farr in February 2002. Farr served as president and chief executive officer of SCM. The Debtor had known Farr since 1994, and they had been friends since at least 2002. SCM sold used cars, as indicated by its name. SCM executed a convertible promissory note in the amount of $2 million to the Limited Partnership Fund with 20% interest in 36 equal month-

ly installments to begin August 1, 2007. In exchange, the Limited Partnership Fund transferred $1,967,000 to SCM between July 27 and August 8, 2007. Between February 15 and May 5, 2008, the Limited Partnership Fund transferred another $240,208 to SCM. Instead of making the payments required under the note, SCM only made payments totaling $140,000 to the Limited Partnership Fund between September 15 and December 8, 2008. SCM made no other payment to the Limited Partnership Fund, with the exception of a $15,500 reimbursement made on June 24, 2008.

On February 28, 2006, Farr formed Second Chance Motors Credit, LLC ("SCM Credit") as a Georgia limited liability company and wholly-owned subsidiary of SCM to lend money to customers of SCM so they could purchase the used cars from SCM. Also on February 28, 2006, Farr formed Second Chance Motors Finance, LLC ("SCM Finance") as a Georgia limited liability company and wholly-owned subsidiary of SCM to lend money to SCM so it could purchase used cars to sell to its customers. (SCM, SCM Credit and SCM Finance are referred to collectively as "SCM Entities".)

In 2007, SCM Finance and the Limited Partnership Fund entered into a membership interest purchase agreement under which the Limited Partnership Fund acquired a 35% interest in SCM Finance in exchange for $1 million that was paid to SCM Finance between August 7 and Octo-

**5.** In their Statement of Undisputed Facts, Plaintiffs refer to the North Point Advisors Questionnaire attached to the Brief as Ex. 22. This questionnaire has not been authenticated and is not admissible. Plaintiffs direct the Court's attention to page 17 of the Questionnaire, where OCA is asked if it has maintained or planned to have certain insurance policies. The typed answer is "Yes". This Questionnaire, without more even if admissible, does not establish the Debtor made a false representation since the question is whether insurance is "planned". The "yes" answer could be truthful. Moreover, there is no evidence the Debtor provided the answer to the question. Thus, at trial, something more than the North Point questionnaire must be presented.

ber 16, 2007. Between August 28, 2008 and March 9, 2009, the Limited Partnership Fund transferred an additional $1,173,000 to SCM Finance. Between February 20, 2008 and September 16, 2009, the Limited Partnership Fund made 90 transfers to SCM Credit ranging from $15,000 to $250,000 and totaling $11,530,750.

Ultimately, the Limited Partnership Fund invested a total of $20,264,236 in five companies. Of this, 80%, or $16,010,958 went to Farr's three SCM Entities: $2,207,208 to SCM; $11,530,750 to SCM Credit; and $2,273,000 to SCM Finance. The other 20% was invested in unrelated companies.

With Farr's SCM Entities receiving over $16 million from the Limited Partnership Fund, Farr used his control to obtain and use for his own purposes some of the money the Limited Partnership Fund invested in the SCM Entities. For example, in September 2007, Farr informed the Debtor that Farr would be using some of the investment money to cure Farr's default of a mortgage loan for a Michigan condominium and to purchase an automotive service facility in Marietta, Georgia. But Farr did not acquire the automotive service facility in the name of any of the SCM Entities. Rather, Farr formed 1097 Sea Jay, LLC ("Sea Jay") which he controlled and owned, either alone or with his wife. On September 10, 2007, Farr withdrew $730,000 of the Limited Partnership Fund investment proceeds and deposited that amount to his and his wife's personal bank account. He then used that money, with the Debtor's knowledge and consent, to cure his mortgage default and to arrange for Sea Jay to purchase the Marietta property. Sea Jay then leased the Marietta property to SCM as its headquarters.

During 2008, the Debtor was having a personal residence constructed in Atlanta and later that year he told Farr he needed money for the construction. The Debtor and Farr agreed that Farr would transfer funds from an SCM Entity bank account to a Sea Jay account, which would then issue checks payable to construction contractors on the Debtor's behalf. During October, November and December 2008, investment proceeds from the Limited Partnership Fund were used to fund Sea Jay checks paid to Debtor's contractors in the total amount of $513,426.10. Also, from December 15 through December 31, 2008, Farr withdrew from Sea Jay and SCM bank accounts Limited Partnership Fund investment proceeds totaling $373,000 and delivered that cash to the Debtor. During 2009, Sea Jay made car payments for the Debtor's nephews and secretary, and helped pay moving expenses for a friend and for Carolyn Dixon. Debtor never repaid any of the money advanced by Sea Jay.

In late 2008, the Debtor, through OCA, proposed to all Plaintiffs that OCA, on behalf of the Limited Partnership Fund, acquire the assets of Stewart Auto Finance, Inc. ("Stewart Auto"), a Georgia corporation unrelated to the Debtor or Farr. After obtaining Stewart Auto's letter of intent to sell substantially all of its assets, OCA issued capital calls to the three Plaintiffs as follows: $3,404,251 to Detroit GRS on or about December 11, 2008; $3,500,000 to Detroit PFRS on or about December 10, 2008; and $1,386,000 to PGERS on or about January 15, 2009. The Plaintiffs honored these capital calls, but the proposed transaction with Stewart Auto was never consummated. Instead, in March 2009, OCA paid most of the funds to SCM Credit. The Debtor never informed Detroit GRS or Detroit PFRS that any Stewart Auto capital call proceeds were transferred to SCM Credit, and he informed PGERS of that use of the pro-

ceeds only after the fact in August 2009 when its staff inquired. With regard to the capital calls to the Plaintiffs for the Stewart Auto transaction, the District Court in its order concluded:

> Dixon and Onyx Capital advised the Pontiac GERS that $2.77 million had been requested from each of the other two pension funds to invest in the $7 million deal. However, Dixon and Onyx Capital had requested and received approximately $3.5 million each from Detroit GRS and Detroit PFRS for the purported $7 million investment, raising a total of $8.29 million. The contributions were not pro rata [as required by the Limited Partnership Agreement].

*SEC v. Dixon*, 2012 WL 4849890, at *6 (citations omitted).

On April 23, 2009, the Debtor and OCA issued a capital call to PGERS requesting the payment of $100,000 in management fees. PGERS paid the amount called, but the Debtor deposited the $100,000 check from PGERS into his personal bank account. The Debtor and OCA never issued a capital call to the other two limited partners for their pro rata share of these alleged fees.

### Representations.

The first element in establishing fraud is that the Debtor made a false representation to the Plaintiffs. Plaintiffs, in their Brief, allege the Debtor made the following misrepresentations:

a) The Limited Partnership Fund would invest in mid-market and/or Midwest companies specializing primarily in manufacturing.

b) The investments would be equity-based.

c) The Limited Partnership Fund would follow a five-step process to determine investments.

d) OCA had an insurance policy or fidelity bond covering wrongdoing.

e) Fullen was the strategic partner in OCA and involved in OCA and its investment decisions.

f) The capital calls for Stewart Auto were divided pro rata among the Plaintiffs.

g) The funds raised from capital calls on Stewart Auto were to be used to acquire Stewart Auto.

h) The capital call to PGERS on April 23, 2009 for $100,000 was to be used for operating expenses.

As the managing member of OCA, who in fact exercised control over it, and who also controlled the Limited Partnership Fund, the representations of OCA and the Limited Partnership Fund are attributable to the Debtor. *See In re Grasso*, 497 B.R. at 443.

First, Plaintiffs allege the Debtor misrepresented the investment criteria for firms in which the Limited Partnership Fund would invest. The Debtor promised investments would be in Midwest and/or mid-market manufacturing companies according to a letter dated October 3, 2006 to the Detroit GRS (Brief Ex. 7 and Ex. A attached thereto), the PPM (Brief Ex. 21) and a PowerPoint presented by the Debtor to each of the Plaintiffs (Brief Ex. 6 and Ex. B attached thereto; Ex. 7 and Ex. B attached thereto; and Ex. 8 and Ex. B attached thereto). In fact, the investments were concentrated on Farr's SCM Entities, none of which was a Midwest manufacturer. The Court cannot conclude the representation regarding the type of companies in which the Limited Partnership Fund would invest was false, however. While it is not disputed that SCM is not a Midwest-based company, or a manufacturing company, it is unknown whether the company would be considered mid-market. The Court notes the investment criteria

were in the alternative. Moreover, the Court notes the Limited Partnership Fund did invest in several other companies to the extent of 20% of its investments. No evidence has been presented as to whether those companies are Midwest-based, middle market or manufacturing companies or when the investments were made. This information is relevant to determining whether the representations in the initial presentations and PPM were false at the time they were made.

Second, the PPM and PowerPoint represented that all of the transactions in which the Limited Partnership Fund would participate would be equity-based, as opposed to a loan. On the other hand, the very first transaction in which the Limited Partnership Fund participated, Plaintiffs allege, was a simple $2 million loan to SCM. The Limited Partnership Fund's loan to SCM occurred on July 27, 2007, only one day after the Detroit PFRS invested in the Limited Partnership Fund and the same day the Detroit GRS invested in the Limited Partnership Fund. (PGERS had not invested in the Limited Partnership Fund at that time.) Pursuant to this loan, $1,967,000 was transferred from the Limited Partnership Fund to SCM between July 27, 2007 and August 8, 2007. The Court concludes, though, material facts remain in dispute as to whether this loan is consistent with the investment criteria since it was a "convertible" loan, meaning convertible to equity. To determine if the Debtor's statement regarding the type of investment transactions planned was false when made, the Court must know more about this and the other transactions consummated.

Third, the Court cannot grant summary judgment to the Plaintiffs as to their allegation that the Debtor misrepresented the process through which the Limited Partnership Fund would determine in which companies to invest. Plaintiffs outline a five-step process that the Debtor promised the Limited Partnership Fund would undertake. There is no evidence, however, as to whether the Debtor followed that process. Plaintiffs only disagree, very strongly, that the investments made would have satisfied any such process. Without more information, the Court cannot grant summary judgment for the Plaintiffs on this allegation.

Fourth, the Debtor is deemed to have admitted in response to DGRS' Admissions No. 24 that he represented to Detroit GRS and Detroit PFRS that OCA maintained one or more insurance policies for errors or omissions of its employees and/or a fidelity bond covering dishonesty, malfeasance, or other wrongdoing of its employees, including the Debtor. It is also undisputed that neither the Debtor nor OCA carried such a liability policy. The Court concludes there is no genuine issue of fact that the representation regarding insurance was made by the Debtor, and was false.

Fifth, Plaintiffs contend the Debtor made false representations regarding Fullen's involvement in the Limited Partnership Fund. The representations regarding Fullen made to the PGERS are discussed above. With respect to the two Detroit pension funds, however, there was no direct letter like the one to PGERS. Rather, the misrepresentation, according to the two Detroit funds, is that Fullen was involved in OCA. While it is undisputed that Fullen was not a principal or a partner in OCA and that he did not receive any compensation from OCA, Fullen himself testified he authorized the Debtor to represent that he was an advisor to the Limited Partnership Fund. As such, the Court cannot determine on a motion for summary judgment, where all inferences are resolved in favor of the non-moving party,

that the representations regarding Fullen's "involvement" were false.

Sixth, Plaintiffs complain the Debtor made misrepresentations with respect to the capital calls for investment in Stewart Auto. The District Court in its opinion examined some of these allegations. The District Court found that the capital calls issued to PGERS misrepresented the actual amount requested from the other two pension funds and misstated all three pension funds' pro rata contribution amounts. The District Court stated:

Dixon and Onyx Capital advised the Pontiac GERS that $2.77 million had been requested from each of the other two pension funds to invest in the $7 million deal. However, Dixon and Onyx Capital had requested and received approximately $3.5 million each from Detroit GRS and Detroit PFRS for the purported $7 million investment, raising a total of $8.29 million. The contributions were not pro rata and Dixon and Onyx Capital actually invested the money into SCM Credit, not in an auto finance company deal as represented by Dixon and Onyx Capital.

*SEC v. Dixon*, 2012 WL 4849890, at *6 (citations omitted). The Court finds there is no genuine issue of material fact that the Debtor represented in the capital call to PGERS false information as to the pro rata nature of the call and the total amount sought.

Seventh, the Debtor represented to all three pension funds that the capital call would be used to invest in Stewart Auto. The Debtor is deemed to have admitted the amount each of the entities paid in response to the capital call and that the proposed transaction with Stewart Auto was not consummated. The Debtor is also deemed to have admitted that in and after March 2009 OCA transferred to SCM Credit most of the proceeds of the capital

calls for the proposed Stewart Auto transaction. The Debtor admits he never informed Detroit GERS or Detroit PFRS that any Stewart Auto capital call proceeds were transferred to SCM Credit and only informed PGERS of the use of the proceeds in August 2009 upon the staff's inquiry (DGRS' Admissions Nos. 19–23), but the Debtor claims the Limited Partnership Agreement did not require him to disclose this change in investment. Plaintiffs have not presented any evidence the Debtor knew at the time the capital call was made that the Stewart Auto transaction had fallen through. The Court therefore cannot conclude that statement was falsely made.

Finally, the Debtor has admitted, through his deemed admissions to PGERS' Admissions, that on April 23, 2009, the Debtor, through OCA issued a capital call to PGERS requesting the payment of $100,000 of management fees. The Debtor, however, deposited the $100,000 check from PGERS into his personal bank account. Further, the Debtor and OCA never issued a capital call to the other two pensions funds for their pro rata share of the fees. The Court finds it to be undisputed that the capital call on April 23, 2009 in the amount of $100,000 was false. The funds paid by PGERS were deposited directly by the Debtor into his personal bank account and were not used for the management fees of the Fund.

So the Court has found the Debtor made a false representation (i) to PGERS when it made a capital call for $100,000, the proceeds of which were deposited in the Debtor's account; (ii) to PGERS in connection with the Stewart Auto capital call which was in excess of the prorated amount; and (iii) to Detroit GRS and Detroit PFRS when the Debtor represented that OCA had an insurance policy or bond to cover employee wrongdoing.

*Knowledge of Falsity, Intent, Reliance and Damages.*

Next, the Court must find the Debtor knew the representations were false, intended to deceive the Plaintiffs and for the Plaintiffs to act on the representation, that the Plaintiffs reasonably and justifiably relied on the representation, and that they were damaged thereby.

### (i) *Knowledge of Falsity*

The Debtor knew the representation to PGERS regarding the Stewart Auto capital call was false. The Debtor, as the managing member of OCA, which was the general partner of the Limited Partnership Fund, was responsible for capital calls and knew how much had been requested from each of the limited partners for the Stewart Auto transaction. He also knew the terms of the Stewart Auto transaction. He therefore requested more money than was required and in amounts that were not equally shared. The Debtor also knew his capital call for $100,000 for the Limited Partnership Fund expenses was actually not for the benefit of the Limited Partnership Fund since he immediately deposited the check in his personal account. Finally, the Court concludes insufficient evidence has been presented at this time that the Debtor knew his statement regarding insurance was false. The only evidence regarding the insurance policy comes from the DGRS' Deemed Admission Nos. 24 and 25. The deemed admissions do not allege the Debtor knew the representation was false.

### (ii) *Intent*

The Court also concludes the Debtor intended to deceive PGERS with the rep-

resentations regarding the Stewart Auto transaction and the expenses and intended for PGERS to act on them. The undisputed facts show the Debtor decided when the capital calls were issued and was responsible for the capital calls and expected PGERS to respond to them, which it did. Thus, the Debtor intended PGERS to rely on the calls and intended to deceive PGERS with the calls.

### (iii) *Reliance*

PGERS must next establish it relied on the false representations.[6] As stated above, justifiable reliance is the standard for Section 523(a) and reasonableness is the standard under Michigan law. Each element of fraud, including reliance, must be proven and cannot simply be assumed. *Field,* 516 U.S. at 71, 116 S.Ct. 437; *Sun-Trust Bank v. Roundtree,* No. 1:12–CV–03449, op. at 838 (N.D.Ga. July 8, 2013). The Court cannot assume for purposes of summary judgment that there was reliance by PGERS on the capital call for Stewart Auto or on the capital call for the $100,000 in management fees. The District Court Order addresses extensively the falsity of the Stewart Auto capital call, but makes no finding regarding reliance. Reliance is not required for purposes of the Securities Anti–Fraud Provisions, so the Court cannot presume reliance simply because the District Court found a violation of the Securities Anti–Fraud Provisions. The capital call for the $100,000 in expenses is discussed only in the deemed admissions. Neither the deemed admissions nor the affidavit of Ellen Zimmermann contain any statement regarding PGERS' reliance on the capital calls.

---

**6.** With respect to the representation that OCA had insurance, the only evidence of this fact is the deemed admission. But neither the deemed admission nor the affidavits of the two Detroit funds make any allegation that the Detroit funds relied upon the existence of an insurance policy before investing. The Court also notes the North Point questionnaire does not ask for any details about the amount of the insurance or who was covered.

The Limited Partnership Agreement at Section 3.1 requires the Debtor to set forth in the capital call the purpose for the funds and a description of how they are to be invested. Section 3.1(a) requires that each capital call notice "describe the anticipated use of the Capital Contribution called pursuant thereto in reasonable detail (including, in the case of a capital call to fund an investment in a potential Portfolio Company, the identity and a description of the business of such entity and the anticipated type and approximate amount of securities to be acquired in such Portfolio Company)." Therefore, the content of the capital call notices regarding Stewart Auto and the $100,000 expense payment are critical to determining PGERS' reasonable and justifiable reliance thereon. Unfortunately, none of the capital call notices are included in the evidence.[7]

Finally, the Court will address the issue of damages. In some instances, the evidence provides a direct link between the investment and the damages suffered. For example, if the evidence ultimately shows that PGERS reasonably relied on the capital call notice for the $100,000 in expenses that was deposited in the Debtor's account, the damages resulting from that false capital call are clear—$100,000. But as to other allegations regarding monies lost to investment in the SCM Entities, there is no evidence from which the Court can conclude how much of each Plaintiff's money was used to make each of the investments. It is also undisputed that some repayments were made to the Limited Partnership Fund by the SCM Entities, raising questions as to how those repayments are credited in calculating damages for each of the Plaintiffs. Lastly, Plaintiffs must show that their losses result from the Debtor's fraud, and not from other causes such as economic forces. *See Zirkel v. Tomlinson (In re Tomlinson)*, 1999 WL 294879, at *15–16 (Bankr.N.D.Ill. May 10, 1999).

In summary, the Court has found there is no issue of disputed fact that the Debtor made three false representations: the capital call for $100,000 to PGERS, the proceeds of which were deposited in the Debtor's account, the capital call to PGERS in connection with the Stewart Auto investment, and the representation to Detroit GRS and Detroit PFRS that OCA had an insurance policy or bond to cover employee wrongdoing. Disputed issues of fact remain as to the other alleged misrepresentations. The Court has found further there is no disputed issue of fact that the Debtor made the representations as to the two capital calls to PGERS with knowledge and intent to deceive and intent PGERS would act on them, but disputed issues of fact remain as to the Debtor's intent with respect to the representation to Detroit GRS and Detroit PFRS regarding the insurance policy. Further, material issues of fact remain as to the Plaintiffs' justifiable and reasonable reliance on each of the representations and as to the damages suffered thereby. As a result, sum-

---

7. The Court notes, for purposes of future trial, the absence of the capital call notices is also detrimental to many of the other claims made by Plaintiffs. For example, even if the investments made in the SCM Entities were not consistent with the representations made in the PPM or in the original presentation by the Debtor, such investments may not have been fraudulent if the nature of those investments was adequately disclosed in the capital call notice itself. *See Zirkel v. Tomlinson (In re Tomlinson)*, 1999 WL 294879, at *13 (Bankr.N.D.Ill. May 10, 1999); *Tocco*, 912 F.Supp.2d at 521 (The Michigan courts have long recognized that a plaintiff cannot establish reasonable reliance by relying "on oral representations that are contradicted by a written document that is readily available to the plaintiff" (citations omitted)).

mary judgment is denied as to Plaintiffs' claims of false representation.

## DISCHARGEABILITY OF ALL PLAINTIFFS' CLAIMS UNDER SECTION 523(a)(2)(A) (FALSE PRETENSES AND FRAUD)

Plaintiffs also allege their claims against the Debtor are non-dischargeable because they were incurred through false pretenses and fraud. Of course, Plaintiffs must first establish their claim, which is alleged only under the Michigan law of fraud.

 In addition to actionable fraud through affirmative misrepresentations discussed above, Michigan law recognizes a cause of action for "silent fraud". "Silent fraud" is "also known as fraud by non-disclosure or fraudulent concealment". *M&D Inc. v. McConkey,* 231 Mich.App. 22, 585 N.W.2d 33, 37 (1998). "A claim of silent fraud 'is essentially the same' as fraudulent misrepresentation 'except that [silent fraud] is based on a defendant suppressing a material fact that he or she was legally obligated to disclose, rather than making an affirmative misrepresentation.' " *Tocco,* 912 F.Supp.2d at 526 (alteration in original) (citation omitted). " 'A fraud arising from the suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood, and courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud.' " *M&D,* 585 N.W.2d at 37 (citation omitted). " 'Mere silence is not enough to sustain a silent fraud cause of action. Instead, a plaintiff must establish that the defendant intentionally suppresse[d] material facts [in order] to create a false impression.' " *Tocco,* 912 F.Supp.2d at 526 (alteration in original) (citation omitted).

 The Michigan courts stress that responses to inquiries must be truthful and must not leave a false impression. Where a party replies to specific inquiries which do not bring forth the facts that the inquirer was seeking to learn, "but were in such form as naturally tended to reassure plaintiffs and to cause them to proceed.... Under such circumstances the concealment of the true facts and the deliberate creating of false impressions and inferences is the equivalent of an express and intentional misrepresentation." *M&D,* 585 N.W.2d at 38 (citations omitted). " 'The gist of the action is fraudulently producing a false impression upon the mind of the other party.' " *Id.* at 39 (citation omitted). Finally, under Michigan law, a representation "can be action or conduct and can be actionable as silent fraud if that action or conduct is intended to create a misimpression to the opposing party." *Id.* at 40.

 Comparing "silent fraud" under Michigan law with false pretenses under Section 523 (a)(2)(A) reveals many similarities. False pretenses as used in Section 523(a)(2)(A) is defined as

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.... A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re Burke,* 405 B.R. at 645 (alteration in original) (citation omitted). "What consti-

tutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.'" *Haeske v. Arlington (In re Arlington)*, 192 B.R. 494, 498 (Bankr.N.D.Ill.1996) (citation omitted). "False pretenses do not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* (citation omitted). "As distinguished from false representation, which is an express misrepresentation[,] false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression, and [i]t is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under § 523(a)(2)(A)" *SunTrust Bank v. Brandon (In re Brandon)*, 297 B.R. 308, 313 (Bankr.S.D.Ga.2002) (alteration in original) (internal citation omitted); *see also Duncan v. Bucciarelli (In reBucciarelli)*, 429 B.R. 372, 375 (Bankr.N.D.Ga. 2010). As one court has described,

> The elements of establishing a nondischargeable claim for false pretenses are similar [to false representations]: In order to establish that a debt is nondischargeable under § 523(a)(2)(A) as a debt for money, property, services, or credit obtained by false pretenses, a plaintiff must prove by a preponderance of the evidence that: "(1) the [defendant] made an omission or implied misrepresentation; (2) promoted knowingly and willingly by the defendant[ ]; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff [ ]; (4) which wrongfully induced the plaintiff[ ] to advance

money, property, or credit to the defendant.

*Adamar of N.J., Inc. v. August (In re August)*, 448 B.R. 331, 350 (Bankr.E.D.Pa. 2011) (alterations in original) (citation omitted).

The final basis for non-dischargeability under Section 523(a)(2)(A) is fraud, which is defined for purposes of Section 523(a)(2)(A) as:

> a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*In re Burke*, 405 B.R. at 646 (citation omitted).

Certain of Plaintiffs' allegations are particularly relevant to the concepts of silent fraud, false pretenses and fraud where the Debtor did not make a specific representation which was false, but rather created a scheme through a series of events, activities or communications which collectively created a false impression as to the Debtor, the Limited Partnership Fund and its investments. The District Court in its Order concluded that the Debtor and OCA "have misappropriated funds from the Onyx Fund [Limited Partnership Fund], in violation of the Investment Advisers Act." *S.E.C. v. Dixon*, 2012 WL 4849890, at *9.

The District Court's factual findings are consistent with the deemed admissions. During 2008, the Debtor was having a personal residence constructed in Atlanta. He and Farr agreed that Farr would transfer Limited Partnership Fund investment proceeds from a SCM Entity bank account to a Sea Jay account. Sea Jay

would then issue checks payable to construction contractors and Farr would deliver them to the Debtor. The Debtor would in turn deliver these checks to the contractors working on his house. During October, November and December 2008, investment proceeds from the Plaintiffs were used to fund Sea Jay checks paid to the Debtor's contractors in the total amount of $513,426.10. No documentation evidencing any debt of the Debtor to Sea Jay was executed contemporaneously with the transfers, but was only executed after the SEC commenced an investigation of the Limited Partnership Fund in mid–2009. Further, from December 15 through December 31, 2008, Farr withdrew from Sea Jay and SCM Entity accounts, Limited Partnership Fund investment proceeds totaling $373,000 and delivered that cash to the Debtor. The Debtor never repaid any portion of the funds.

The District Court's findings supporting this misappropriation conclusion are binding on this Court because the findings were necessary to the District Court's conclusion that the Debtor violated the IAA, Sections 206(1) and (2), 15 U.S.C. § 80(b)–6, –1 and –2. These sections impose liability on investment advisers who

1) Employ any device, scheme or artifice to defraud any client or prospective client; or

2) Engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client.

*Scienter* is required for liability under Section 206(1), but is not required for liability under Section 206(2). *SEC v. K.W. Brown & Co.*, 555 F.Supp.2d 1275, 1308 (S.D.Fla. 2007): The *scienter* required to prove a violation under Section 206(1) of the IAA is the same *scienter* utilized under the Securities Anti–Fraud Provisions. *Id.* (citation omitted).

■ The District Court found the Debtor acted with *scienter* in this action, which is sufficient to show intent under both Michigan law and Section 523. The Debtor created a contrived and misleading understanding of the transaction by directing capital calls for investment and then using the money personally. Even if Plaintiffs knew that money was being invested or loaned to SCM Entities or even to Sea Jay, under no circumstances would they know or expect the funds to ultimately end up in the Debtor's pocket. The District Court concluded the Debtor "employed a device, scheme, or artifice to defraud" which is the same standard as used by Section 523(a)(2)(A). This scheme of the Debtor is exactly the type of "scheme or artifice" to defraud that Section 523(a)(2)(A) was meant to address. The Court therefore concludes Plaintiffs have a claim for $886,426.10 for the Debtor's fraud which is non-dischargeable as a result of actual fraud and false pretenses. The Court, however, cannot enter judgment because there is no evidence in the record as to which Plaintiffs' monies were used to make the personal payments to the Debtor.

While Plaintiffs contend the entire organization and operation of the Limited Partnership Fund was a *fraud or a false pretense*, the undisputed facts are not sufficient for the Court on a motion for summary judgment to grant judgment on that theory. The Plaintiffs claim that all of the Debtor's activities and communications created a "false and misleading understanding of the Limited Partnership." (Brief at 31). The information provided by the Debtor before Plaintiffs signed the Limited Partnership Agreement created an impression that the Plaintiffs would be participating in an opportunity for high returns from mid-market companies through equity investments. Plaintiffs

contend that, instead, the Debtor intended all along for the Limited Partnership Fund to be a pipeline of money to Farr and to the Debtor personally. The Limited Partnership Fund did, however, invest in companies unrelated to Farr, the Debtor or SCM Entities which, on a motion for summary judgment, the Court cannot say were part of a scheme to defraud the Plaintiffs. Moreover, the record does not include any of the capital calls from which the Court could determine if the Plaintiffs relied on such a scheme. So summary judgment is granted only to the extent the Debtor misappropriated Plaintiffs' funds.

## CONCLUSION

Based on the foregoing, the Court grants summary judgment to PGERS in the amount of $3,643,200 as a result of the Debtor's fraudulent Letter to PGERS regarding Fullen's position with OCA. This claim is non-dischargeable.

The Court grants summary judgment to all Plaintiffs that they have a collective claim for $886,426.10 resulting from the Debtor's fraud and misappropriation of money. This claim is non-dischargeable. Nevertheless, Plaintiffs must present evidence at the trial from which the Court can conclude the amount each Plaintiff was damaged by the misappropriation.

The Motion is denied as to all other claims.

**IT IS ORDERED**